## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| YYZ, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No. 13-136-SLR |
| v. | ) |
| | ) **PUBLIC VERSION** |
| HEWLETT-PACKARD COMPANY, | ) |
| | ) |
| Defendant. | ) |
| YYZ, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No. 13-579-SLR |
| v. | ) |
| | ) |
| ADOBE SYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |
| YYZ, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No. 13-581-SLR |
| v. | ) |
| | ) |
| PEGASYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

## DEFENDANTS' OPENING BRIEF FOR SUMMARY JUDGMENT
## THAT THE ASSERTED CLAIMS OF THE
## PATENTS-IN-SUIT ARE INVALID UNDER 35 U.S.C. § 101

# TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II.   SUMMARY OF ARGUMENTS ................................................................................... 2

III.  STATEMENT OF UNDISPUTED FACTS ................................................................. 3

   A.  Disclosure of the Patents-in-Suit ....................................................................... 3

   B.  The Asserted Claims of the Patents-in-Suit ....................................................... 6

IV.   ARGUMENT ............................................................................................................. 8

   A.  The Asserted Claims of the Patents-in-Suit are Directed to the Abstract Idea
       of Collecting and Saving Data Relating to a Business Process ......................... 10

   B.  The Elements of the Asserted Claims Do Not Amount to Significantly More
       than the Abstract Idea ..................................................................................... 18

   C.  The Asserted Claims do Not Satisfy the Machine or Transformation Test ..................... 22

V.    CONCLUSION ......................................................................................................... 22

i

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013)............................................................. 9, 18

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014).................................................................*passim*

*Association for Molecular Pathology v. Myriad Genetics*,
  133 S. Ct. 2107 (2013).......................................................................... 8

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*,
  687 F.3d 1266 (Fed. Cir. 2012)............................................................. 9, 18

*Bilski v. Kappos*,
  561 U.S. 593 (2010)................................................................. 10, 16, 22

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*,
  No. 6:12-cv-674, 2014 WL 923280 (E.D. Tex Jan. 21, 2014) ................................ 13

*Cloud Satchel, LLC v. Amazon.com, Inc.*,
  C.A. No. 13-cv-941-SLR, 2014 WL 7227942 (D. Del. Dec. 18, 2014) ................... 3, 8, 20, 21

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
  717 F.3d 1269 (Fed. Cir. 2013)................................................................. 3

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011).............................................................. 2, 13

*Diamond v. Diehr*,
  450 U.S. 175 (1981)............................................................................ 8

*Gottschalk v. Benson*,
  409 U.S. 63 (1972)............................................................................ 19

*Intellectual Ventures I, LLC v. Mfrs. and Traders Trust Co.*,
  C.A. No. 13-cv-01274-SLR, 2014 WL 7215193 (D. Del. Dec. 18, 2014) ....................... 21

*Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*,
  C.A. No. 12-1138-SLR, 2014 WL 7149400 (D. Del. Dec. 15, 2014) .......................*passim*

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
 132 S. Ct. 1289 (2012) ................................................................................................. 8, 9, 10

*Open Text S.A. v. Box, Inc.*,
 No. 13-cv-04910-JD, 2015 WL 269036 (N.D. Cal. Jan. 20, 2015) ........................................... 2

*Ultramercial, Inc. v. Hulu, LLC*,
 772 F.3d 709 (Fed. Cir. 2014) ................................................................................... *passim*

*Walker Digital, LLC v. Google, Inc.*,
 C.A. No. 11-cv-318-LPS, 2014 WL 4365245, (D. Del. Sept. 3, 2014) .................................. 19

**Statutes**

35 U.S.C. § 101 ........................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 1, 8

Pursuant to the Court's January 9, 2015 order and in accordance with Fed. R. Civ. P. Rule 56(a), defendants Hewlett-Packard Company ("HP"), Adobe Systems, Inc. ("Adobe"), and Pegasystems Inc. ("Pegasystems") (collectively, "Defendants") respectfully move for summary judgment that the asserted claims of the patents-in-suit are invalid for failure to satisfy the requirements of 35 U.S.C. § 101.

## I.   NATURE AND STAGE OF PROCEEDINGS

This is an action alleging patent infringement.  Plaintiff YYZ, LLC ("YYZ") filed a complaint against HP on January 24, 2013, alleging that HP infringes claims of United States Patent Nos. 7,062,749 ("the '749 patent") and 7,603,674 ("the '674 patent") (jointly the "patents-in-suit").[1]  See D.I. 1.[2]  On April 11, 2013, YYZ filed complaints against Adobe and Pegasystems, similarly alleging that they infringe claims of the patents-in-suit.  See YYZ, LLC v. Adobe Systems, Inc., No. 13-cv-579-SLR (D. Del.), D.I. 1; YYZ, LLC v. Pegasystems Inc., No. 13-cv-581-SLR (D. Del.), D.I. 1.  YYZ subsequently elected to assert claims 22, 23, 27, 28, and 29 of the '749 patent and claims 51, 52, 55, 56, and 57 of the '674 patent against HP; claim 55 of the '749 patent and claims 1, 2, 3, 6, 7, 38, 41, 46, and 47 of the '674 patent against Adobe; and claims 1, 2, 3, 4, 5, and 56 of the '749 patent and claims 70, 71, 75, and 76 of the '674 patent against Pegasystems (jointly the "asserted claims").  See Decl. of Matthew J. Faust ("Faust Decl."), filed herewith, Exhibit A at 1.  Fact discovery closed on July 31, 2014.[3]  The Court issued its claim construction order on December 12, 2014.  D.I. 112.  On January 9, 2015, the parties jointly sought, and received, an order staying all further proceedings but allowing the

---

[1]  Copies of the '749 patent and '674 patent were attached as exhibits to YYZ's complaint.  See D.I. 1-1 (the '749 patent), D.I. 1-2 (the '674 patent).
[2]  Unless otherwise noted, all references to docket entries contained herein refer to the docket for YYZ LLC v. Hewlett-Packard Co., No. 13-cv-00136-SLR (D. Del.).
[3]  D.I. 48 at 3 and June 10, 2014 docket text granting D.I. 48.

filing and adjudication of the present motion.   D.I. 114; Faust Decl., Ex. B at 18 (docket entry

granting D.I. 114).

## II.   SUMMARY OF ARGUMENTS

1. The asserted claims of the patents-in-suit are directed to a basic and fundamental idea:

the collection and storage of information relating to a business process.  The independent claims

of the asserted patents broadly claim this abstract concept.  The dependent claims add nothing

more than details and generalities, such as identifying generic categories of information (e.g.,

"customer information") that must be included in the stored information, tacking on the mental

step of "reviewing" the stored information, adding other generic steps such as "distributing" the

stored information, or reciting routine steps performed by conventional computer components

such as "providing access" to the stored information.  "[T]his concept existed well before the

invention of the [] patents . . . . The problem with the asserted claims is that their core concept is

inherently abstract, and their implementation, which consists of standard technology like

browsers, servers, and networks, has nothing inventive whatsoever about it." *Open Text S.A. v.*

*Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 269036, at *1 (N.D. Cal. Jan. 20, 2015).

2. The abstract nature of the claims is confirmed by the fact that these fundamental

concepts can be—and have been—performed by human actors without the use of a computer as

part of everyday procedures for as long as businesses have kept records.   *See CyberSource Corp.*

*v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) ("It is clear that unpatentable

mental processes are the subject matter of claim 3.  All of claim 3's method steps can be

performed in the human mind, or by a human using a pen and paper.").  The few technical

elements that exist in YYZ's asserted claims relate solely to the use of generic and conventional

computer technology in a routine and known manner to accomplish the copying, saving, and (for

certain claims) retrieving, distributing or reviewing the copied business information.  The use of

2

known computing technology to implement abstract ideas does not transform them into patent-eligible subject matter. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (2014); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014). The asserted claims also fail to satisfy the machine-or-transformation test, further confirming that the claims are directed to non-statutory subject matter.

3.  Because the asserted claims are directed to abstract ideas without any ties to novel technological advances, they are directed to subject matter that is not eligible for patent protection under 35 U.S.C. § 101. As this is strictly a legal determination, summary judgment is appropriate. *See Cloud Satchel, LLC v. Amazon.com, Inc.*, C.A. No. 13-cv-941-SLR, 2014 WL 7227942, at *3 (D. Del. Dec. 18, 2014) (citing *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1277 (Fed. Cir. 2013), aff'd, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)).

## III.   STATEMENT OF UNDISPUTED FACTS

### A. Disclosure of the Patents-in-Suit

The '674 patent is a continuation of the '749 patent. As such, both patents contain substantially the same specification.[4] The specifications of both patents disclose a system directed to measuring, monitoring and tracking communications in business processes using conventional and generic computer elements.[5] Figure 1 depicts an example of such a business process consisting of "a sample process, Order to Cash, which is comprised of various sub-processes: Receive Order Inquiry, Provide Customer Quotation, Create Customer Outline

---

[4] For convenience, all citations herein will be made to the specification of the '749 patent, with the understanding that the same disclosure may be found in the specification of the '674 patent, which is identical in all relevant aspects.

[5] The specifications describe the invention as "computer-based apparatus and systems for measuring, monitoring, [and] tracking . . . enterprise communications and processes in an asynchronous messaging environment." '749 patent at 1:8-11.

Agreement, Create Sales Order, Schedule Production, Manufacture Product, Ship Product and

Invoice Customer." *See* '749 patent at 3:39-43.  As depicted in Figure 1, each of these sub-

processes (e.g., "Receive Order Inquiry") communicates with the next sub-process (e.g.,

"Provide Customer Quotation") "through a messaging broker, such as an IBM MQSeries

component." *Id.* at 3:46-48.  That is, the "Receive Order Inquiry" sub-process sends a message

(containing some data) to the next sub-process ("Provide Customer Quotation").  The patent

refers to these messages transferred from one business sub-process to another as "original

messages."  These original messages are transferred through an intermediary, a known type of

communication software called a "message broker."  The patents concede that message broker

software was available at the time of invention from companies such as IBM.  *Id.* at 3:46-48.

The exemplary business process depicted in Fig. 1, including the use of a message broker in a

business process, is an illustration of what was already well-known and in commercial use prior

to the purported invention of the patents-in-suit.  *See id.* at 3:45-51 ("In the example shown in

[FIG. 1], the sub-processes actually communicate through a messaging broker, such as an IBM

MQSeries component . . . . This messaging broker permits certain sophisticated messaging uses,

such as message queuing, some data translation, etc."); Faust Decl., Exhibit C at 394:16-395:4



; Exhibit D at 36:12-16

    The purported invention, depicted in Fig. 2, merely adds two conventional and generic

computer elements to the prior art scenario depicted in Fig. 1: "a messaging component" and a

"central repository." The messaging component[6] is used to create copies of at least part of each "'original message' received by the broker." '749 patent at 3:53-55.[7] This messaging component is not a novel technological advance. Indeed, the specification explains that one way to add the "messaging component" is simply to configure the existing functionality of the message broker to enable a copying function. *Id.* at 3:64-67 ("IBM's MQSeries messaging broker provides a component that can be configured to perform a copying function for the messages it receives, and so create monitoring messages for the messages it receives.").

The second element added by the inventors is a "central database repository or database" used to store the copied original message data provided to the database by the monitoring message. *Id.* at 3:55-60. This, like the messaging component, is not a novel technological advance. As the patents explain, the "central message repository or database" is nothing more than a generic storage element for storing "information passing through the enterprise." *Id.* at 3:15-16.

The patents admit that the applicants did not invent any of the computerized elements of the claims. Central databases were not new. Message brokers were not new. The basic concept of brokers acting as intermediaries is far older than computers and had already been implemented in commercial computer software such as the MQSeries message broker available from IBM. Messaging components were not new. Indeed, the patents state that a messaging component is provided using "methods known in the art," and the patents concede that one such known method was configuring existing message broker functionality. *Id.* at 3:64-67 ("IBM's MQSeries messaging broker provides a component that can be configured to perform a copying

---

[6] In Fig. 2, this "messaging component" is illustrated by the text inside the message broker box that reads: "If message is on path A, then Create Monitoring Message A."
[7] The copied original message is called a "monitoring message." In other words, the monitoring message can simply be a copy of an original message.

function for the messages it receives, and so create monitoring messages for the messages it receives."). Thus, the patents describe a purported invention that amounts to nothing more than using generic computer technology to carry out business processes, such as the following exemplary process: a customer calls a hypothetical enterprise, "Widget Co.," and asks whether Widget Co. has a certain product. *Id.* at 4:5-7. "That customer request will begin the Receive Order Inquiry sub-process which will end with the generation of a Receive Order Inquiry message traveling to the Provide Customer Quotation sub-process through the messaging broker component." *Id.* at 4:7-12. "When the messaging broker receives the message on Path A, it will create a monitoring message, and send the monitoring message to the central database repository, as shown in FIG. 2." *Id.* at 4:12-15; *see also id.*, Fig. 2. "[T]he data contained in the monitoring message is generated from the message on Path A." *Id.* at 4:15-17.

**B.  The Asserted Claims of the Patents-in-Suit**

Claim 1 of the '749 patent is representative of the other asserted independent claims, and is reproduced below for the Court's convenience:

1.   A computerized method for use in an asynchronous messaging environment, wherein said messaging environment comprises at least one original message comprised of original message data, comprising:

> providing, through a monitoring message, at least part of said original message data to a central message repository;

> populating a transaction record in said central message repository with said original message data provided by said monitoring message;

> wherein said original message data comprises the status of an activity.

6

This claim is directed to the communication process described in the above "Widget Co." example and encompasses nothing more than saving data related to a business process in a database.[8]

The other asserted claims of the patents-in-suit merely add insignificant and generic details to the foregoing, and do not alter the fundamental concept encompassed by claim 1. For example, claim 2 of the '749 patent adds the abstract step of "reviewing data collected" in the transaction record. Likewise, claim 22 of the '749 patent simply requires performing the steps of claim 1 twice (for two sub-processes), and claim 27 of the '749 patent adds the abstract step of "reviewing said central message repository." Claim 55 of the '749 patent requires that the original message data comprise the status of a "process" instead of an "activity."[9] Similarly, claim 1 of the '674 patent requires that the original message data comprise the status of an "activity," "sub process," or "process," and adds the step of "retrieving information from the central message repository." Claim 46 of the '674 patent adds "distributing information from the central message repository using a real-time tool which tracks the progress of transaction records and/or processes," reciting insignificant and token post-solution activity enabled here by the use of generic computers. Claim 51 of the '674 patent is nearly identical to claim 1 of the '749 patent, but adds "reviewing data collected" in the transaction record and specifies that the original message data comprises status information of a "process and/or sub process" rather than an activity. Claim 70 of the '674 patent is equivalent to claim 22 of the '749 patent, requiring only that the method be performed for two activities rather than two sub-processes. As explained

---

[8] Claim 1 carries out these steps within an "asynchronous messaging environment," which the Court construed as an environment where "data is transmitted through messages (instead of large files) without prior coordination between communication end points." D.I. 112 at 2.

[9] Per the Court's claim construction, a process is a "business operation," a sub-process is "a step of a business operation" and an activity is "part of a step of a business process." D.I. 112 at 2-3.

below, the remaining asserted claims of the patents-in-suit contain trivial variations on the abstract concept encompassed by claim 1 of the '749 patent, either restricting types of information to certain common categories or identifying routine functionality enabled by the use of generic and conventional computers such as copying, accessing, and updating data.

## IV.    ARGUMENT

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Whether a claim is drawn to patent-eligible subject matter under 35 U.S.C. § 101 is a threshold inquiry to be determined as a matter of law in establishing the validity of the patent." *Cloud Satchel*, 2014 WL 7227942 at *3 (citing *CLS Bank Int'l*, 717 F.3d at 1277)). Thus, summary judgment is appropriate to resolve whether the asserted claims of the patents-in-suit are directed to eligible subject matter under 35 U.S.C. § 101. *See, e.g.*, *Cloud Satchel*, 2014 WL 7227942 (granting summary judgment that asserted claims of patent-at-issue were invalid under 35 U.S.C. § 101); *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, C.A. No. 12-1138-SLR, 2014 WL 7149400 (D. Del. Dec. 15, 2014) (same).

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." However, the Supreme Court has "long held that this provision contains an important implicit exception. '[L]aws of nature, natural phenomena, and abstract ideas' are not patentable.'" *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 132 S. Ct. 1289, 1293 (2012) (quoting *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)) (alterations in original). "Rather, 'they are the basic tools of scientific and technological work' that lie beyond the domain of patent protection." *Association for Molecular Pathology v. Myriad Genetics*, 133 S. Ct. 2107, 2116 (2013) (quoting *Mayo*).

Recently, the Supreme Court "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*).  First, a court should determine "whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1296-97).  If the court determines that the claims are directed to a patent-ineligible concept, such as an abstract idea, the court should then proceed to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1297-98). The second step of this analysis has also been described as "a search for an 'inventive concept'— *i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1294) (alterations in original).

Importantly, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. . . ." *See Alice,* 134 S. Ct. at 2358; *see also Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible. . . .  Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis."); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("[S]imply implementing an abstract concept on a computer, without meaningful limitations to that concept, does not transform a patent-ineligible claim into a patent-eligible one.") (citing *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1280 (Fed. Cir. 2012)).  Likewise, merely limiting the use of the abstract idea to a particular

technological environment is insufficient to save an otherwise patent-ineligible claim. *See Ultramercial*, 772 F.3d at 716 ("Narrowing the abstract idea of using advertising as a currency to the Internet is an 'attempt[] to limit the use' of the abstract idea 'to a particular technological environment,' which is insufficient to save a claim.") (quoting *Alice*, 134 S. Ct. at 2358) (alterations in original).

The patents-in-suit issued prior to the Supreme Court's seminal decisions in *Mayo* and *Alice*, and their validity vis-à-vis 35 U.S.C. § 101 has never been considered by the United States Patent and Trademark Office in accordance with the framework set forth in those decisions. When assessed under the rubric of *Mayo* and *Alice*, it is evident that the asserted claims of the patents-in-suit are directed solely to the abstract and well-known idea of collecting information relating to a business process and saving a copy of that information for later use. The elements of the asserted claims amount to no more than the abstract idea itself; the only technical elements recited are expressly described in the patents as conventional, generic prior art computer components and systems. The claims "do not, for example, purport to improve the functioning of the computer itself. . . . [n]or do they effect an improvement in any other technology or technical field." *See Alice*, 134 S. Ct. at 2359. As such, the asserted claims of the patents-in-suit are invalid for failure to satisfy the requirements of 35 U.S.C. § 101.

A.     **The Asserted Claims of the Patents-in-Suit are Directed to the Abstract Idea of Collecting and Saving Data Relating to a Business Process**

In *Alice*, the Supreme Court found that the challenged claims were drawn to the abstract idea of intermediated settlement, "'a fundamental economic practice long prevalent in our system of commerce.'" *Alice*, 134 S. Ct. at 2355-56 (citing *Bilski v. Kappos*, 561 U.S. 593 (2010)). The asserted claims of the patents-in-suit are likewise directed to the abstract idea of collecting and saving information relating to a business process—a well-known, routine, and

fundamental business practice. *See, e.g.*, Faust Decl., Ex. F (U.S. Patent No. 2,307,036, issued January 5, 1943, pertaining to "business stationery and forms for recording business transactions," wherein "the data inscribed upon the topmost or original record strip is transferred to underlying strips by interleaved transfer or carbon material.").

Claim 1 of the '749 patent illustrates the abstract nature of the asserted claims. Claim 1 recites a method for collecting a copy of information relating to a business process. The claim has two steps: (1) sending a copy of information relating to the status of a business activity to a central repository; and (2) storing the copied information in a record in the central repository. That is the entirety of the claim. "This ordered combination of steps recites an abstraction—an idea, having no particular concrete or tangible form." *Ultramercial*, 772 F.3d at 715 (finding the claims of the patent-at-issue were directed to the abstract idea of offering free media in exchange for watching advertisements). Indeed, "the concept embodied by the majority of the limitations describes only the abstract idea" of collecting and saving information relating to a business process. *See id.* This abstract idea had been used in commerce long before the applications that led to the patents-in-suit were filed.

Any business using carbon copy forms is practicing the abstract idea recited in the patents-in-suit of collecting and saving information relating to a business process. Consider the example provided above for the "Widget" company (*supra* at 6). The above example can be practiced by human actors using a pen and paper. A call is received by an employee of Widget Co. seeking to purchase a certain product. *See* '749 patent at 4:5-7. The employee in the department that handles the "Receive Order Inquiry" step takes down the order information (which may include the purchaser's name, address, Widget model number, quantity), and records the status of the order inquiry as "awaiting price quote." The employee may write the

information onto a standardized form such as the carbonless paper form described in U.S. Patent No. 2,307,036 (Faust Decl., Ex. F), which creates a carbon copy of the written information. Conceptually, the paper form on which the order information is written is no different than what the patents call an "original message."[10]  Further, the carbon copy of that form is the same as the claimed "monitoring message" because it is a copy of the original message. *See* '749 patent at 3:64-67 ("IBM's MQSeries messaging broker provides a component that can be configured to perform a copying function for the messages it receives, and so create monitoring messages for the messages it receives.").  Of course, any additional information could also be typed, written or printed onto the carbon copy.

In our example, the employee sends the original paper form containing the order information to the next sub-process or activity (i.e., to the "Provide Customer Quotation" activity), and the carbon copy is sent to a records department or a file cabinet for future reference and use.  This abstract principle has been used across all types of businesses.  For example, stores and restaurants used carbon copies to copy and save customer orders.  Shippers used carbon copies to copy and save shipping orders.  Contractors used carbon copies to track the progress of maintenance and repair work.  Even patent lawyers once used carbon copies while prosecuting patent applications, to copy and save patent-related drafts and communications.  The patents-in-suit are directed to this same abstract idea:  "When the messaging broker receives the message on Path A, it will create a monitoring message, and send the monitoring message to the central database repository, as shown in FIG. 2." '749 patent at 4:12-15; *see also id.*, Fig. 2.

---

[10]  D.I. 112 at 3 (construing "original message" as "a message originating from a business process, sub process, or activity carrying information for the execution of a business process, sub process, or activity.")

12

"[T]he data contained in the monitoring message is generated from the message on Path A." *Id.* at 4:15-17.

The abstract nature of the asserted claims is confirmed by the fact that they can be performed by human actors without the use of a computer. *See CyberSource*, 654 F.3d at 1372 ("It is clear that unpatentable mental processes are the subject matter of claim 3. All of claim 3's method steps can be performed in the human mind, or by a human using a pen and paper."); *see also Joao Bock*, 2014 WL 1749400 at *6 (using a hypothetical of human actors performing the claimed computer-implemented banking practices to illustrate the abstract nature of the claims). Humans can manage and monitor business processes by keeping and updating records related to the business process. This can be accomplished with a pencil and paper. *See Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, No. 6:12-cv-674, 2014 WL 923280, at *6 (E.D. Tex Jan. 21, 2014) (holding claimed process for inventory-based selling was the equivalent of a "store clerk, armed with only pencil and paper"). In addition to the scenarios above, consider the following scenario showing specifically how independent claim 1 of the '749 patent can be performed without a computer by human actors using only pen and paper:

| '749 Claim Language | Performance Without a Computer |
|---|---|
| 1. A computerized method for use in an asynchronous messaging environment, wherein said messaging environment comprises at least one original message comprised of original message data, comprising: | Intra-office mail is a classic example of an asynchronous messaging environment that operates without prior coordination between communication endpoints (i.e., point A can send a message to point B without any prior coordination).[11] The paper form filled out by the employee (i.e., original message) includes |

---

[11] The Court construed "asynchronous messaging environment" as "a computer-based environment in which data is transmitted through messages (instead of large files) without prior coordination between communication end points." D.I. 112 at 2.

| | information regarding the caller's order inquiry (i.e., the original message data). That paper form and/or its carbon copy can be sent to another employee through intra-office mail without prior coordination between the two employees. |
|---|---|
| providing, through a monitoring message, at least part of said original message data to a central message repository; | The carbon copy (monitoring message) is routed via intra-office mail to the records department (central message repository) for storage and later use, in addition to sending the original paper form (original message) via intra-office mail to the next department for further action,.[12] |
| populating a transaction record in said central message repository with said original message data provided by said monitoring message; | Storing the carbon copy of the form (which of course contains the data) in a customer file in a filing cabinet. |
| wherein said original message data comprises the status of an activity. | The carbon copy includes the information of the original paper form, which could include any information about the business operation, including, for example, the fact that the customer's order inquiry has the status of "awaiting price quote." |

The abstract idea embodied in claim 1 of the '749 patent—collecting and saving business process information for later use—is a basic precept of business and a conventional business practice. The remaining asserted claims of the patents-in-suit do not add any limitations that

---

[12] The Court construed "monitoring message" as a "message . . . created by the messaging component of a messaging broker . . . where a messaging broker is communication software that performs at least message transformation and routing based on information in the message" and "central message repository" as a "database for storing monitoring messages from more than one process, sub-process, or activity." D.I. 112 at 4, 5.

direct them to anything other than the same abstract idea. The other independent claims present minor language variations to claim 1 of the '749 patent, and the majority of the dependent claims either add additional steps that are mental processes performed in the human mind (e.g., "determining the status" of the business operation from the stored information) or are utterly generic (e.g., "reviewing" or "distributing" the stored information), or limit the collected information to certain categories common to business transactions or processes (e.g., "customer information").

Specifically, in the '749 patent, dependent claim 2 adds nothing more than the mental process step of "reviewing data collected in said transaction record," while claims 3, 4, and 5 merely limit the contents of the "original message data" to common categories of information associated with business transactions (date, time, customer number, materials, quantity, and amount for claim 3; various identifiers, part numbers, quantity, date and time for claims 4 and 5). Independent claim 22 of the '749 patent is analogous to claim 1, but simply adds repeating the process a second time—generating, transmitting, and storing "original message data" for a second sub-process instead of just one. Dependent claims 23 and 27 add the mental process steps of "determining the status of said process" and "reviewing said central message repository," respectively, to claim 22. Claim 28 depends from claim 27, and simply identifies the reviewed information as any one of several common categories of information associated with business transactions (e.g., reviewing order information, customer information, process information, daily information, weekly information, etc.). Claim 29 specifies that process progress information be distributed in "real time"[13] without any limitations on how to do so. Independent claims 55 and 56 of the '749 patent are nearly identical to claim 1, differing only in

---

[13] The Court has construed "real time" to mean "in a non-deferred manner." D.I. 112 at 7.

that claim 55 substitutes the term "process" for "activity," while claim 56 replaces the term "activity" with "sub process."

Likewise, independent claim 1 of the '674 patent is nearly identical to claim 1 of the '749 patent, but encompasses information relating to the status of a "process," "activity," or "sub process," (all of which are related) and adds the token step of "retrieving" information from the central message repository. Claims 2, 3, 6, and 7 merely specify the type of information retrieved as information commonly associated with business transactions (information about an order for claim 2, information about a customer for claim 3, and information across a time span for claim 6; claim 7 specifies the time span is at least one day, at least one week, or at least one month). Claim 38 requires that information is retrieved "on a secure basis," reciting a basic characteristic enabled by generic computer components. Claim 41 adds to claim 1 the common step of "providing a report." Independent claim 46 of the '674 patent is nearly identical to claim 1, adding only the additional step of "distributing information from the central message repository using a real-time tool which tracks the progress of transaction records and/or processes," claiming routine functionality enabled by generic computer components (without further explanation as to how it would be done). Claim 47 specifies that information is distributed using an intranet, an extranet, or the Internet; this restriction is merely another attempt to apply the use of the abstract idea to a particular technological environment, which is insufficient to circumvent the prohibition against patenting abstract ideas. *See Alice*, 134 S. Ct. at 2358 (quoting *Bilski*, 561 U.S. at 610-11). Independent claim 51 of the '674 patent is analogous to claim 1 of the '749 patent, adding only the mental process step of "reviewing data collected in said transaction record," and specifying that the original message data includes status information of "a process and/or sub process." Claim 52 merely requires that the "original

message data" of claim 51 include at least one of several common categories of information relating to business transactions. Claim 55 adds the common step of "providing the status of a process by providing access to said central message repository." Claim 56 requires that "data other than said original message data" is added to the monitoring message, and claim 57 adds the step of "updating said transaction record." Each of these dependent claims adds nothing of substance to the abstract idea encompassed by the independent claim, and recites steps that can be performed by human actors without the use of a computer.

Independent claim 70 of the '674 patent is identical to claim 22 of the '749 patent, except that the term "a sub process" is substituted for "a process," and the term "activity" is substituted for the term "sub process." Claim 71 adds the mental process step of "determining the status of said process," while claim 75 adds the mental process step of "reviewing said central message repository." Claim 76 merely limits the information reviewed to common categories of information relating to a business process (order information, customer information, time slice information, performance information, etc.).

As described above, none of the asserted claims of the patents-in-suit vary significantly from claim 1 of the '749 patent, nor do they add any substantive limitations. All of the claims are directed to the abstract idea of collecting information relating to a business process, saving a copy of that information, and sometimes reviewing the saved information. In addition, all of the claims can be performed by human actors without the use of a computer.[14] Simply stated, there is nothing in the asserted claims other than the abstract idea of collecting, storing and reviewing commonplace business information. Like the abstract idea of intermediated settlement in *Alice*,

---

[14] Examples illustrating how each asserted claim may be performed by human actors without the use of a computer can be found in Appendix A, attached hereto.

the abstract idea here is a fundamental economic practice long prevalent in our system of commerce.

### B.   The Elements of the Asserted Claims Do Not Amount to Significantly More than the Abstract Idea

Abstract ideas are not patentable.  Likewise, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358; *see also Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible . . . .  Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis."); *Accenture*, 728 F.3d at 1345 ("[S]imply implementing an abstract concept on a computer, without meaningful limitations to that concept, does not transform a patent-ineligible claim into a patent-eligible one.") (citing *Bancorp.*, 687 F.3d at 1280).  "[T]he relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer." *Alice*, 132 S. Ct. at 2359. The asserted claims of the patent-in-suit are invalid under § 101 because they do no more than recite the abstract idea of collecting, copying and storing business information using well-known general purpose computer technology.

Further, each of the following technical elements recited in the asserted claims are well-known general purpose computer technology that existed well before the patents-in-suit: (i) an "asynchronous messaging environment," as recited in the claim's preamble; (ii) a "monitoring message," which the Court construed as being created by (iii) the messaging component of a messaging broker; and (iv) a "central message repository," which the Court construed as a "database." *See* D.I. 112 at 4-5.

Specifically, asynchronous communication environments, as the Background of the patents-in-suit acknowledge, were ubiquitous at the time of the filing of the '749 patent. *See* '749 patent at 1:38-46 ("communications are increasingly asynchronous or message based"; "[e]nterprise communications are now increasingly asynchronous, or connectionless, transmitting data without prior coordination between communication end points . . . .").

Likewise, the patents-in-suit do not purport to have invented messaging brokers[15] or even messaging brokers with a component capable of generating monitoring messages—the patents-in-suit identify the prior art IBM MQSeries messaging broker as existing computer technology that provided a messaging component for creating monitoring messages:  "For example, IBM's MQSeries messaging broker provides a component that can be configured to perform a copying function for the messages it receives, and so create monitoring messages for the messages it receives." '749 patent at 3:64-67.

The "central message repository" is simply a generic database used for its conventional purpose, the electronic storage of data. *See Alice*, 134 S. Ct. at 2359 ("Using a computer to create and maintain 'shadow' accounts amounts to electronic record-keeping—one of the most basic functions of a computer.") (citing *Gottschalk v. Benson*, 409 U.S. 63, 65 (1972)).  Clearly, "storing records" does not render the claims patentable. *See Alice*, 134 S. Ct. at 2360 ("Nearly every computer will include a . . . "data storage unit" capable of . . . storage . . . ."); *Walker Digital, LLC v. Google, Inc.*, C.A. No. 11-cv-318-LPS, 2014 WL 4365245, at *8-9 (D. Del. Sept. 3, 2014) (equating the storage of information in a "database" to a file cabinet).

---

[15]  The Court's claim construction of the term "monitoring message" states that "a messaging broker is communication software that performs at least message transformation and routing based on information in the message."

Indeed, all of the above components "are being employed for basic functions, including storage, transmitting and receiving information . . . such components are not 'specific' or 'special purpose' computers." *Joao Bock*, 2014 WL 7149400 at *7. As such, "the patents do not claim an improvement to the computer, but rather describe how to apply the abstract idea . . . to pre-existing, conventional computers." *Cloud Satchel*, 2014 WL 7227942 at *8. In short, each of the computer components recited in the asserted claims was well-known in the prior art, as admitted by the patents and by the inventors during deposition. *See* Faust Decl., Ex. E at 161:14-20



; Exhibit D at 36:12-16

; Exhibit D at 95:18-25

The remaining asserted claims of the patents-in-suit do not alter or add any limitations that change the foregoing analysis. As discussed above, the dependent claims add only pure mental process steps, additional generic steps representing nothing more than abstract ideas, or limit the collected information to some common business information such as date, quantity, customer name or number, etc. Such limitations fail to add anything of significance to the abstract idea of the base claims. *See Joao Bock*, 2014 WL 7149400 at *8 (limiting the dollar amount of a transaction or limiting authorized vendors "does not restrict the claim, instead, it provides a list of common transaction limitations . . . ."). Other dependent claims do nothing

more than recite routine functionality enabled by a generic, general purpose computer, such as requiring that process progress information is distributed in "real time" (i.e., in a non-deferred manner).[16] "These additional limitations likewise do not 'ensure that the patent in practice amounts to significantly more than a patent upon' the abstract idea . . . ." *Intellectual Ventures I, LLC v. Mfrs. and Traders Trust Co.*, C.A. No. 13-cv-01274-SLR, 2014 WL 7215193, at *12 (D. Del. Dec. 18, 2014) (citing *Alice*, 134 S. Ct. at 2355). None of the limitations tacked on to the abstract idea claimed in the patents-in-suit are enough to transform the claims into patent-eligible subject matter. *See Ultramercial*, 772 F.3d at 717 (citing *Alice*, 134 S. Ct. at 2357).

None of the asserted claims of the patents-in-suit require any specific or special purpose computer components that elevate the claims beyond the abstract idea of collecting and saving common business information. "[A]llowing the asserted claims to survive would tie up any innovation related to performing" the claimed routine processes and "would, in turn, monopolize the 'abstract idea.'" *Joao Bock*, 2014 WL 7149400 at *8. The recitation of an asynchronous messaging environment and the restriction that a monitoring message be created by the messaging component of a messaging broker are simply "an 'attempt[] to limit the use' of the abstract idea to a particular technological environment,' which is insufficient to save a claim." *See Ultramercial*, 772 F.3d at 716 (quoting *Alice*, 134 S. Ct. at 2358). Such preemption of the abstract idea of copying and collecting business process data for later use is not permissible under 35 U.S.C. § 101 because it would disproportionately tie up the use of these fundamental concepts. *See, e.g., Cloud Satchel*, 2014 WL 7227942 at *9 ("The pre-emption inquiry focuses on whether the patent 'would risk disproportionately tying up the use of the underlying ideas.'")

---

[16] D.I. 112.

(quoting *Alice*, 134 S. Ct. at 2354).  Thus, the asserted claims of the patents-in-suit are invalid for failure to satisfy the requirements of 35 U.S.C. § 101.

### C.      The Asserted Claims do Not Satisfy the Machine or Transformation Test

Finally, while "not the sole test for determining whether an invention is a patent-eligible 'process'" the Supreme Court has described the "machine-or-transformation test" as a "useful and important clue . . . for determining whether some claimed inventions are processes under § 101." *Bilski*, 561 U.S. at 604.  Here the machine-or-transformation test confirms that the asserted claims of the patents-in-suit are invalid as directed to non-statutory subject matter.  With respect to the first prong of the test, none of the asserted claims are tied to any specific machine. The claims require only conventional, general purpose computer components, which is insufficient to render a claim patent-eligible under 35 U.S.C. § 101.  *See Ultramercial*, 772 F.3d at 716-17.  As regards the second prong of the test, none of the asserted claims cause an article to be transformed into a different physical state or thing.  The claims merely recite the abstract idea of populating copied data in a record in a database.

## V.      CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment that the asserted claims of the '749 and '674 patents are invalid for failure to satisfy the requirements of 35 U.S.C. § 101.

Respectfully submitted,

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Charlene M. Morrow
Virginia K. DeMarchi
Phillip Haack
Enia A. Titova
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500

By:    /s/ Bindu A. Palapura
      Richard L. Horwitz (#2246)
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com
      bpalapura@potteraderson.com

Ryan J. Marton
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Tel:  (415) 875-2300

*Attorneys for Defendant Adobe Systems, Inc.*

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Lewis V. Popovski
Matthew J. Faust
KENYON & KENYON LLP
One Broadway
New York, NY 10004
Tel:  (212) 425-7200

By: /s/ Bindu A. Palapura
      Richard L. Horwitz (#2246)
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com
      bpalapura@potteranderson.com

Megan W. Olesek
KENYON & KENYON LLP
1801 Page Mill Road , Suite 210
Palo Alto, CA 94304
Tel:  (650) 384-4700

Dated:  February 10, 2015
Public Version Dated: February 17, 2015
1181731/38879

*Attorneys for Defendant Hewlett-Packard
Company*

OF COUNSEL                              DRINKER BIDDLE & REATH LLP

Kent E. Baldauf, Jr.                    By:   */s/ Francis DiGiovanni*
James J. Bosco                                Francis DiGiovanni (#3189)
Bryan P. Clark                                222 Delaware Ave., Ste. 1410
THE WEBB LAW FIRM                             Wilmington, DE 19801-1621
One Gateway Center                            Tel:  (302) 467-4266
420 Fort Duquesne, Suite 1200                 Francis.DiGiovanni@dbr.com
Pittsburgh, PA 15222
Tel: (412) 471-8815                     *Attorneys for Defendant Pegasystems, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I, Bindu A. Palapura, hereby certify that on February 18, 2015, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on February 18, 2015, the attached document was electronically

mailed to the following person(s)

Brian E. Farnan
Farnan LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
bfarnan@farnanlaw.com

Jacqueline Knapp Burt
James Francis McDonough
Jonathan Miller
Joseph J. Gleason
Heninger, Garrison & Davis, LLC
3621 Vinings Slope, Suite 4320
Atlanta, GA  30339
jburt@hgdlawfirm.com
jmcdonough@hgdlawfirm.com
jmiller@hgdlawfirm.com
jgleason@hgdlawfirm.com

Steven Ritcheson
Heninger, Garrison & Davis, LLC
9800 D Topanga Canyon Blvd., #347
Chatsworth, CA  91311
switcheson@hgdlawfirm.com

René A. Vazquez
Heninger, Garrison & Davis, LLC 18326
Buccaneer Terrace
Leesburg, VA  20176
rvazquez@hgdlawfirm.com

M. Blair Clinton
Heninger, Garrison & Davis, LLC 2224 1st
Avenue North
Birmingham, AL  35203
bclinton@hgdlawfirm.com

By:   */s/ Bindu A. Palapura*
Richard L. Horwitz
David E. Moore
Bindu A. Palapura
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

1106880 / 40269

2