# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| YYZ, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 13-cv-136-SLR |
| | ) | |
| HEWLETT-PACKARD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| YYZ, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 13-cv-579-SLR |
| | ) | |
| ADOBE SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| YYZ, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 13-cv-581-SLR |
| | ) | |
| PEGASYSTEMS INC., | ) | |
| | ) | |
| Defendant. | ) | |

**YYZ'S BRIEF IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE INVALID UNDER 35 U.S.C. § 101 AND CROSS-MOTION FOR SUMMARY JUDGMENT THAT THE CLAIMS ARE NOT INVALID UNDER 35 U.S.C. § 101**

Dated: February 27, 2015

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301

# TABLE OF CONTENTS

I.     NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II.    SUMMARY OF ARGUMENTS ................................................................................... 1

III.   STATEMENT OF DISPUTED FACTS AND ADDITIONAL FACTS ....................... 2

   A.   Technology Background of the Patents-In-Suit. ............................................... 3

   B.   Facts Concerning The Inventions of the Patents-in-Suit .................................. 5

   C.   Problems Addressed By the Asserted Claims. ................................................ 10

   D.   The Solutions Provided By the Inventions of the Patents-in-Suit. ................. 14

   E.   Facts Related to Whether the Asserted Claim Preempt the Alleged Abstract Idea .............. 17

   F.   Facts Related to the Alleged Representative Claim and Other Asserted Claims ................... 20

   G.   Related Proceedings Involving The Alleged Joint Defense Group Leader ......................... 20

IV.   ARGUMENT ............................................................................................................ 22

   A.   The Patents-in-Suit Are Presumed Valid. ...................................................... 22

   B.   Software and Business Methods Remain Eligible For Patent Protection. ................. 23

   C.   The Claims of the Patents-in-Suit Are Patent Eligible Within The Framework Set Forth By Supreme Court and Federal Circuit. ............................................................. 25

      1.   The Claims Are Not Directed To An Abstract Idea. ..................................... 26

      2.   The Patents Claim Inventive Concepts. ........................................................ 33

      3.   The Claims of the Patents Do Not Preempt the Alleged Abstract Idea ........... 34

   D.   The Factual Issues Underlying Defendants' Motion Are Disputed, Precluding Summary Judgment. ........................................................................................................ 37

V.    CONCLUSION ........................................................................................................ 40

# TABLE OF AUTHORITIES

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) ................................ 23, 24, 28, 34

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997)....................................................... 39

*Allergan, Inc. v. Apotex Inc.,* 754 F.3d 952 (Fed. Cir. 2014); cert. denied, 2015 WL 132989, 83
    U.S.L.W. 3270 (U.S. Jan. 12, 2015) (No. 14-465)....................................................... 22

*Ameranth, Inc. v. Genesis Gaming Solutions, Inc., No.* SACV 11-00189 AG, 2014 U.S. Dist.
    LEXIS 175600 (C.D. Cal. Nov. 12, 2014)....................................................... 25, 30, 31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)....................................................... 39, 40

Anderson, 477 U.S. at 255, 106 S.Ct. 2505 ....................................................... 39

*Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336 (1961) ............................. 25, 27

*Bilski v. Kappos,* 130 S.Ct. 3218 (2010)....................................................... 23, 24

*buySAFE, Inc. v. Google, Inc.,* , , --- F.3d ----, 2014 WL 4337771 (Fed. Cir. Sep. 3, 2014) ......... 24

*Cal. Inst. Of Tech. v. Hughes Commc'ns, Inc.*, No. 2:13-CV-07245-MRP-JEM, 2014 U.S. Dist.
    LEXIS 156763 (C.D. Cal. Nov. 3, 2014)....................................................... 29, 32, 34

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,*. --- F.3d ----, 2014
    WL 7272219 (Fed. Cir. Dec. 23, 2014) ....................................................... 24

*Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011)............................. 29

*DDR Holdings, LLC v. Hotels.com, L.P.*, Case No. 2013–1505, --- F.3d ----, 2014 WL 6845152
    (Fed. Cir. Dec. 5, 2014)....................................................... 24, 29, 35

*Diamond v. Diehr*, 450 U.S. 175 (1981)....................................................... 25, 28

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276 (Fed. Cir. 2005)................................. 38

*Fairfield Indus. v. Wireless Seismic, Inc.*, No. 14-CV-2972, 2014 U.S. Dist. LEXIS 176599 (S.D.
    Tex. Dec. 23, 2014)....................................................... 35

*Fr. Telecom S.A. v. Marvell Semiconductor Inc.*, No. 12-CV-04967-WHO, 2014 U.S. Dist.
    LEXIS 52564 (N.D. Cal. Apr. 14, 2014) ....................................................... 38

*Helios Software, LLC v. SpectorSoft Corp.*, Case No. 12-cv-081-LPS 2014 WL 4796111 (D. Del.
    Sep. 18, 2014)....................................................... 28

*Intellectual Ventures I LLC v. Mfrs. & Traders Trust Co.*, Civ. No. 13-1274-SLR , 2014 U.S.
    Dist. LEXIS 174725 (D. Del. Dec. 18, 2014) ....................................................... 35

*Intellectual Ventures I, LLC v. Motorola Mobility, LLC*, --- F.Supp.3d ----, 2014 WL 5468429
    (D. Del. Oct. 28, 2014)....................................................... 22

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005)................................. 38

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.,* 132 S.Ct. 1289, 182 L.Ed.2d 321
    (2012). ....................................................... 23, 26

*McRo, Inc. v. Sega of Am., Inc.*, No. CV 12-10327-GW, 2014 U.S. Dist. LEXIS 135267 (C.D.
    Cal. Sept. 22, 2014)....................................................... 35

*Microsoft Corp. v. i4i Ltd. Partnership,* 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011)................ 22, 23

Powell v. Carey Intern., Inc., 490 F.Supp.2d 1202 (S.D. Fla. Mar. 17, 2006) ............................. 39

*Radio Corp. of America v. Radio Engineering Laboratories, Inc.*, 293 U.S. 1 (1934) ............... 22

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).................................................. 39

*Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010)........................... 29, 35

*SRAM Corp. v. ADII Eng'g, Inc.*, 465 F.3d 1351 (Fed. Cir. 2006) ............................................ 38

*TQP Dev., LLC v. Intuit Inc.*, No. 12-CV-180, 2014 U.S. Dist. LEXIS 20077 (E.D. Tex. Feb. 19, 2014)............................................................................................................................................... 38

*Ultramercial v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013), *vacated on other grounds*, 134 S. Ct. 2870 (2014) ....................................................................................................... 26, 27, 37

*Ultramercial, Inc. v. Hulu, LLC*, --- F.3d ----, 2014 WL 5904902 (Fed. Cir. Nov. 14, 2014) .... 24

## Statutes

35 U.S.C. § 101 ........................................................................................................................... 21

35 U.S.C. § 102 ........................................................................................................................... 21

35 U.S.C. § 103 ........................................................................................................................... 21

35 U.S.C. § 112 ........................................................................................................................... 21

35 U.S.C. § 282(a) ...................................................................................................................... 21

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................................... 37

Fed. R. Civ. P. 56(c)(1) ............................................................................................................... 37

Fed. R. Civ. P. 56(c)(1)(A) & (B).................................................................................................. 37

## Constitutional Provisions

U. S. Const., Art. I, § 8, Cl. 8....................................................................................................... 22

## I.      NATURE AND STAGE OF PROCEEDINGS

Plaintiff YYZ, LLC ("YYZ") filed suit against Hewlett-Packard Company ("H-P"), Adobe Systems, Inc., and Pegasystems, Inc. ("Defendants") for infringement of U.S Patent Nos. 7,602,749 ("the '749 Patent") and 7,603,764 ("the '674 Patent") (collectively, the "Patents-in-Suit," attached as <u>Exhibit A</u> and <u>B</u>, respectively).[1] The cases are presently consolidated for pretrial purposes. Fact discovery has been completed and a claim construction order has been issued. *See* D.I. 112, attached as <u>Exhibit C</u> ("Claim Construction Order").[2] On December 23, 2014, H-P informed this Court that it had filed petitions with the USPTO to institute Covered Business Method Review (hereinafter, "CBM") for the '749 and '674 Patents. D.I. 113. YYZ has disclosed Wayne M. Schutz as its expert. The Defendants have disclosed Mr. David Linthicum as their expert. *See* Defendants' Expert Disclosures, attached as <u>Exhibit J</u>. Per stipulation of the parties, this Court has vacated the remaining scheduled dates in order to first hear the Defendants' Motion for Summary Judgment of Invalidity under 35 U.S.C. § 101.

## II.     SUMMARY OF ARGUMENTS

1.      Relying on only attorney argument and without any support from one of ordinary skill in the art, Defendants grossly mischaracterize the asserted patent claims in an effort to cast the inventions as abstract. Instead of analyzing the claims as a whole, as the Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l* requires, Defendants offer simplistic shorthand labels of the patent claims, disregard claim limitations, and ignore improvements and applications of the inventions. According to *DDR Holdings, LLC v. Hotels.com, L.P.,* when properly construed, the asserted claims cover concrete, innovative computing solutions to

---

[1] References to exhibits made herein refer to the exhibits attached to the Declaration of James F. McDonough, III.

[2] Cites to D.I. in this brief refer to the docket in C.A. No 1:13-cv-136-SLR.

problems arising in today's complex information technology computer networks.  As explained below, the '674 and '749 patents disclose.

2.      None of the asserted claims describes techniques that can be performed in the human mind and *Alice Corp. Pty. Ltd. v. CLS Bank Int'l* does not indicate any such standard is the benchmark to meet for claim to be patent eligible.   In short, the inventions are not directed to abstract ideas and, in any event, the patent claims describe inventive concepts including specific applications and improvements to technologies critical in enterprise applications and asynchronous networking environments. Furthermore, there is no risk that the patent claims will preempt the broad abstract ideas that Defendants use to mischaracterize the inventions, because the patent claims are far more concrete and specific.

3.      Lastly, Defendants' present no competent evidence, such as a declaration from one of (at least) ordinary skill in the art, to support its factual assertions.   According to *Ultramercial, Inc. v. Hulu, LLC*, this alone is reason to deny Defendants' motion. Even if Defendants had offered competent evidence from an expert, essentially all the factual issues underlying the determination of patent eligibility are disputed by YYZ, thereby precluding summary judgment.  Conversely, YYZ's cross-motion should be granted because Defendants have provided no competent evidence from an expert that creates a material question of fact that demonstrates that a reasonable jury could find in their favor.

## III.    STATEMENT OF DISPUTED FACTS AND ADDITIONAL FACTS

The alleged facts in Defendants' "Statement of Undisputed Facts," which are supported by mere attorney argument and attorney interpretations of the specification, are far from undisputed.

### A.  Technology Background of the Patents-In-Suit.

The inventions of the Patents-in-Suit use a very specific set of technologies and invented a set of solutions to problems that existed in very specific technological environments. Defendants contend that all asserted claims are directed to the abstract idea of "the collection and storage of information relating to a business process." Defendants' Opening Brief, D.I. 116 at 2. The "abstract idea" proposed by Defendants is much broader than the asserted claims. Declaration of Wayne M. Schutz, dated February 27, 2015, at ¶37, attached as <u>Exhibit D</u> ("Schutz Decl."). A person of ordinary skill in the art at the time of the priority date seeking to create an enterprise software solution would have been aware of many combination of many various solutions involving "the collection and storage of information relating to a business process" that are not covered by the asserted claims. Schutz Decl., <u>Ex. D</u>, at ¶37.

A person of ordinary skill would have had a myriad of options for the high-level architecture of such a system, including several options for, among other things, each of the ***data transfer technology***, the ***communication network technology***, and the ***middleware technology***. Schutz Decl., <u>Ex. D</u>, at ¶38. First, the skilled artisan could have used any of several ***data transfer technologies***, including at least an application-based system, a remote procedure call (or RPC) system, a large file transfer system, or a message-based system. Schutz Decl., <u>Ex. D</u>, at ¶39. These data transfer technologies each come with certain benefits and disadvantages. *Id.* The claims of the patents-in-suit are only directed to message-based systems. Schutz Decl., <u>Ex. D</u>, at ¶40; *see also, e.g.,* '749, Claim 1; Claim Construction Order, <u>Ex. C</u>, at 2 (construction for "asynchronous messaging environment").

Second, even assuming a person of ordinary skill chose to use a message-based system, further decisions would need to be made regarding the ***communication network technology***.

Schutz Decl., Ex. D, at ¶40.  Specifically, such a person would know that they would have to choose between using a synchronous message-based communications network technology and an asynchronous message-based communications network technology.  Schutz Decl., Ex. D, at ¶41. Asynchronous message-based communication networks differ from synchronous message-based communication networks in that "asynchronous or message based communications permit loosely coupled connections among and between systems because the end points do not have to be prepared to receive the data when the message is transmitted" '749 Patent at 1:49-52; Schutz Decl., Ex. D, at ¶42.  Such asynchronous message-based communications networks offer many advantages. Schutz Decl., Ex. D, at ¶42.  For instance, "[l]oosely coupled connections permit more flexibility in assembling processes" '749 Patent at 1:52:53. Schutz Decl., Ex. D, at ¶43. There are many other benefits to using asynchronous communications that differentiate it from other communication styles, including the fact that communicating programs can run at different times and there are no constraints on application structure.  Schutz Decl., Ex. D, at ¶¶43-45. Asynchronous message-based communications network systems are able to sustain very high transaction rates because of these two facts, and for this reason are usually chosen for high volume application systems.  Schutz Decl., Ex. D, at ¶46.  The claims of the patents-in-suit are only directed to asynchronous message-based communications networks. Schutz Decl., Ex. D, at ¶47; *see also, e.g.,* '749, Claim 1; Claim Construction Order, Ex. C, at 2 (construction for "asynchronous messaging environment").

Despite their benefits and their widening adoption in 2000, asynchronous message-based communication network technologies nevertheless had problems at the time. Schutz Decl., Ex. D, at ¶¶47-50.  "At any given time, precise information on the progress of the processes is difficult to obtain– messages may be in transit and not instantly locatable"—this was generally

referred to as the **"Where's My Message"** problem.  '749 Patent at 2:6-9; Schutz Decl., <u>Ex. D</u>, at ¶50.  Messages could be lost, misplaced or delayed in large networks due to configuration errors, network failure issues, security settings, repeated program failures, or application coding errors, among other things. Schutz Decl., <u>Ex. D</u>, at ¶50.

Assuming a person of ordinary skill chose to use an asynchronous message-based communications network, further decisions would still need to be made regarding the ***type of middleware technology*** to use in the system.  Schutz Decl., <u>Ex. D</u>, at ¶¶51-52.  Such a person would know that several middleware options were available, including at least point-to-point communications, transaction processing monitors (such as TP monitors), message queuing middleware (such as MQ Series or TIBCO's Rendezvous system), database middleware, application servers, or the use of message brokers. Schutz Decl., <u>Ex. D</u>, at ¶52. The claims of the patents-in-suit are only directed to asynchronous message-based communications networks which use a message broker as middleware.  Schutz Decl., <u>Ex. D</u>, at ¶53; See, e.g., '749, Claim 1;  Claim Construction Order, Ex. C, at   2 (construction for "asynchronous messaging environment"), 4 (construction for "monitoring message").

### B.  Facts Concerning The Inventions of the Patents-in-Suit

At the outset, the specifications of both patents ***do not*** disclose a system directed to measuring, monitoring and tracking communications in business processes using conventional and generic computer elements.  Declaration of Wayne M. Schutz, dated February 27, 2015, at ¶76, attached as <u>Exhibit D</u> ("Schutz Decl.").  Defendants' characterization of the inventions is incorrect for a number of reasons.  *Id.*  First, Defendants are incorrect that the asserted claims "disclose a system directed to measuring, monitoring and tracking communications in business processes."  Schutz Decl., <u>Ex. D</u>, at ¶77.  This characterization is overly broad, and ignores that

the patents-in-suit are limited to "enterprise communications and processes ***in an asynchronous messaging environment***." '749 Patent at 1:8-11; Schutz Decl., <u>Ex. D</u> at ¶47, ¶77.  As noted in the Patents-in-Suit, communications in an enterprise used to be primarily synchronous, or connection oriented, in which a connection is established with prior coordination between communication end points with data then being transmitted over the connection. At the time of the inventions, enterprise communications were becoming increasingly asynchronous, or connectionless, allowing the transmission of data without prior coordination between communication end points, such as through "event based" communications which use messages to move data instead of large files, which permits more flexibility in assembling and modifying enterprise communications.  '749 Patent at 1:39-48.  Although the flexibility of an asynchronous messaging based environment is desirable, asynchronous or message based communications can be problematic because of their loosely coupled nature; for example messages may be in transit and not instantly locatable so their status data is not known, so that an enterprise that uses an asynchronous messaging environment for its operations or processes would have problems attempting to monitor the operations or processes. '749 Patent at 1:49-2:23.  Thus, the Patents-in-Suit exist in an asynchronous environment and fix problems only existing in asynchronous environments.  Schutz Decl., <u>Ex. D</u> at ¶77

Second, the asserted claims do not use "conventional and generic computer elements." Schutz Decl., <u>Ex. D</u> at ¶78.  For example, message brokers, which are a required component of each independent claim,[3] may have existed at the priority date of the Patents-in-Suit, but they

---

[3] "Monitoring message" has been construed to mean "[a] message distinct from an original message, created by the messaging component of a messaging broker that contains at least part of the original message data, where a messaging broker is communication software that performs at least message transformation and routing based on information in the message."  *See* Claim Construction Order, <u>Ex. C</u>, at p. 4.

were far from being "conventional and generic technology." Schutz Decl., <u>Ex. D</u> at ¶78. In fact, according to two books written by Defendants' own expert (in 2000 and 2001), message brokers were still considered "new technology" in as late as 2001—although they offered "real promise," the existing solutions to the "message brokering problem" had a "lack of standardization" and functionality, including a lack of management layer tools resulting in an absence of the "ability to monitor message movement through the system." Schutz Decl., <u>Ex. D</u> at ¶78; Linthicum, Enterprise Application Integration, Addison-Wesley Longman, Copyright 2000, at pp. 10, 21, 120, 293, 309, 316, attached as <u>Exhibit E</u> ("Linthicum I"); Linthicum, B2B Application Integration, e-Business-Enable Your Enterprise, Addison-Wesley Longman, Copyright 2001, at pp. 128, 146, 233, 234, 248-249, 257, attached as <u>Exhibit F</u> ("Linthicum II")

Defendants also incorrectly assert that the "messaging component" which the asserted claims add to the messaging broker is also a "conventional and generic computer element." Defendants' Opening Brief, D.I. 116 at 4-5; Schutz Decl., <u>Ex. D</u> at ¶79. Defendants provide no evidence to support this statement, and even if they had, the statement is wrong for a number of reasons. First, this allegation ignores the Court's claim construction, which states that the messaging component[4] creates the monitoring message of the claims, which is then sent by the messaging broker to the central message repository,[5] where the monitoring message data stored in "[a] record in the central message repository" that is updated as "monitoring messages progress through any given process and/or sub-process." Claim Construction Order, <u>Ex. C</u> at p.

---

[4] The monitoring message is "created by the messaging component of a messaging broker that contains at least part of the original message data, where a messaging broker is communication software that performs at least message transformation and routing based on information in the message." Claim Construction Order, <u>Ex. C</u>, at 4.
[5] The central message repository is a "[d]atabase for storing monitoring messages from more than one process, sub-process, or activity."

6; Schutz Decl., <u>Ex. D</u>, at ¶79 There is nothing "conventional or generic" about this because it did not exist at the time.  Schutz Decl., <u>Ex. D</u>, at ¶¶ 45, 79.

Second, the messaging component of the message broker, which is required in each of the asserted claims, was a new custom piece of software, and was certainly not something provided by IBM. Schutz Decl., <u>Ex. D</u> at ¶79; Deposition of Kenneth Fritz, dated September 2, 2014, pp. 393-394 and pp. 400-407, attached as <u>Exhibit G</u>) (the "Fritz Deposition").  Defendants argue that the "messaging component" is not "novel" because the specification says it can be added to the message broker "simply" by "configur[ing] the existing functionality of a message broker to enable a copying function," Defendants' Opening Brief, D.I. 116 at 5.   However, this is incorrect. Schutz Decl., <u>Ex. D</u> at ¶80. Defendants' allegation is based on Defendants' counsel's misinterpretation of the text from the specification and misunderstanding of IBM's message broker.  Schutz Decl., <u>Ex. D</u> at ¶80-82.

The "IBM MQ Series messaging broker" referred to in the specification was known as MQ Integrator.  Schutz Decl., at <u>Ex. D</u> ¶¶81, 82; Fritz Deposition, <u>Ex. G</u>., at 395:5-396:11.   MQ Integrator allowed customers to add functionality to their message broker by creating custom components (created by writing custom source code), which were often referred to as "plug-ins." Schutz Decl., at <u>Ex. D</u> ¶¶65, 81, 82.  Once that custom component was created, the developer could add the custom component to the available tools in MQ Integrator and the developer could use the custom code by adding the custom component to a toolbox that would allow you to use that custom component in a message flow.  Schutz Decl., at <u>Ex. D</u> ¶¶65, 81, 82.  There was not, however, any tool in the MQ Integrator toolbox at the priority date of the Patents-in-Suit which a customer could drag-and-drop to create a messaging component which would create monitoring messages and send those messages from the message broker to a central message repository for

storage in a transaction record. Schutz Decl., at Ex. D ¶¶81, 82.  Thus, the messaging component was new, not conventional, and a key part of the "inventive concept" of the asserted claims. Schutz Decl., at Ex. D ¶¶65-67, 81.

With respect to the "central database repository," Defendants claim that "the second element added by the inventors is a 'central database repository or database' used to store the copied original message data provided to the database by the monitoring message," alleging that this is not a novel technological advance, and finally concluding that "the 'central message repository or database' is nothing more than a generic storage element for storing 'information passing through the enterprise.'"   Defendants' Opening Brief, D.I. 116 at 5; Schutz Decl., at Ex. D ¶84.   Again, this evidentially unsupported conclusion amounts to nothing more than attorney argument.   *Id.*  Further, this argument ignores the Court's claim construction, which states that the central message repository[6] is the location where the monitoring message data stored in "[a] record in the central message repository" that is updated as "monitoring messages progress through any given process and/or sub-process."  Claim Construction Order, Ex. C at p. 6; Schutz Decl., Ex. D, at ¶84.  The central repository of the Patents-in-Suit, which store monitoring messages created by the messaging component of a messaging broker, and stores the data from those messages in a transaction record, did not exist in 2000.  Schutz Decl., Ex. D, at ¶¶65, 78-84.

Thus, Defendant's claim that "the patents admit that the applicants did not invent any of the computerized elements of the claims"[7] is incorrect.  Schutz Decl., Ex. D, at ¶¶75-84.  And while databases were not new, the "central message repository" of the Patents-in-Suit was new.

---

[6] The central message repository is a "[d]atabase for storing monitoring messages from more than one process, sub-process, or activity."
[7] Defendants' Opening Brief, D.I. 116 at 5.

Schutz Decl., Ex. D, at ¶¶78-84.  As explained above, Defendants' own expert repeatedly stated that message brokers were still considered "new technology" as late as 2001, recognizing the fact that they could not "monitor message movement through" the enterprise.  Schutz Decl., Ex. D, at ¶¶75-78.  And undoubtedly, the messaging component was a newly invented computerized element created to fix recognized problems with the then new message brokering technology. Schutz Decl., Ex. D, at ¶¶65-67, 79-81.  Defendants have misinterpreted the specification's text, which in relevant part states that "IBM's MQSeries messaging broker provides a component that can be configured to perform a copying function for the messages it receives, and so create monitoring messages for the messages it receives,"[8] to mean that this was out-of-the-box functionality.  However, both the inventors and Mr. Shutz explain that this is not true.  Schutz Decl., Ex. D, at ¶¶65-67, 79-82; Fritz Deposition,  Ex. G, at 400:3-403:21 (with Mr. Fritz referencing the "source code" used to implement the messaging component and stating that he did not "agree with [the idea that MQ Integrator "already had this component in it").  In conclusion, the patents describe anything but "a generic computer technology to carry out business processes."[9]

### C.  Problems Addressed By the Asserted Claims.

As noted in Section III.A above, around the priority date of the Patents-in-Suit, message brokers were still a newly and rapidly developing middleware technology.  Schutz Decl., Ex. D, at ¶54; *see, also, supra,* Section III.A.  Very few vendors sold software solutions including message brokers, and even fewer sold software solutions that would operate in an asynchronous, message-based computer network environment and which also included message broker technology.   Schutz Decl., Ex. D, at ¶54; *see, also, supra,* Section III.A. Defendants' expert, Mr.

---

[8] '749 Patent, at 3:64-67.
[9] Defendants' Opening Brief, D.I. 116 at 6.

Linthicum, agrees that message brokers were a new and emerging technology at the time that still had many problems, were unstandardized, and were not conventional or generic.  Schutz Decl., Ex. D, at ¶54; *see, also, supra,* Section III.A.  Mr. Linthicum refers to this fact throughout both books he authored during the relevant time period.  Schutz Decl., Ex. D, at ¶¶54-55; *see, also, supra,* Section III.A.  In fact, in the very late 1990s and early 2000s, message brokers were just beginning to be used in enterprise application systems.  Schutz Decl., Ex. D, at ¶55.  As Mr. Lithicum notes, "[a]dministration and management of the [enterprise application system] is primarily the responsibility of the management layer of the message broker.  Unfortunately, too many message brokers [we]re marketed with little or no management."  Linthicum I, Ex. E, at 309, 316; Schutz Decl., Ex. D, at ¶56

The "Where's my message" problem was known to those skilled in the art. In fact, this problem was recognized by Defendants' expert, Mr. Linthicum, in as late as 2001.  In one of his books on the topic of enterprise systems, Mr. Linthicum recognized that whoever solved the "Where's my message" problem would gain the "lion's share of this growing market":

> Administration and management of the B2B application integration problem domain is primarily the responsibility of the management layer of the message broker.  Because of the level of the technology's maturity and the fact that several enterprise management tools are on the market, too many message brokers are marketed with little or no management.
>
> B2B application integration solutions require the ability to start and stop source and target applications as well as the ability to monitor important statistics, such as performance, message integrity, and the general functioning of the entire B2B application integration problem domain.  Some message broker vendors are correctly anticipating the needs of B2B application integration management and are creating separate products to address these needs while enabling existing enterprise management tools to handle the special needs of B2B application integration. ***These vendors stand to win the lion's share of this growing market. The management layers of message brokers need to support other features, including the ability to monitor message movement through the system***.  These

> features must include alerts to requeue throughput, alerts to requeue availability, and end-to-end performance tracking.
>
> Although it is too early to predict with certainty, it appears that a new generation of management tools built specifically for the B2B application integration marketplace is on the horizon. However, until that generation arrives, users must either depend on what is bundled with the message broker or create their own management infrastructure.

Linthicum II, Ex. E, at 248-249; Schutz Decl., Ex. D, at ¶69. Thus, even while message brokers were becoming more popular in the enterprise systems, they were exacerbating the "**Where's my Message**" problem by failing to provide an "out of the box" management layer for tracking messages. Schutz Decl., Ex. D, at ¶57. According to Linthicum, "[t]he management layers of message brokers need[ed] to support other features, including the ability to monitor message movement through the system." Linthicum II, Ex. F, p. 249; Schutz Decl., Ex. D, at ¶58. And although tools were available on the market from general-purpose management software companies, many of these general-purpose management tools, such as "BMC's Patrol and Computer Associate's UniCenter, fail[ed] to address the management requirements of [enterprise systems], which include the ability to monitor message traffic, message integrity, and the coordination of the distribution of messages among target applications." Linthicum I, Ex. E, at 309; Schutz Decl., Ex. D, at ¶58.

A company called Bristol Technology, Inc. was also acutely aware of the "Where's my message" problem. During Mr. Schutz's time at IBM, he was a primary point of contact between Bristol Technology and IBM as Bristol worked to develop eSleuth,[10] which was a software product designed to work with IBM's MQSeries message queuing middleware. Schutz Decl., Ex. D, at ¶70. As of the priority date of the Patents-in-Suit, Bristol had not thought of using IBM's MQSeries Integrator message broker to solve the "Where's my message" problem.

---

[10] This software package is now owned by H-P as a result of H-P purchasing Bristol Technology, Inc. eSleuth is asserted as prior art by Defendants.

Schutz Decl., Ex. D, at ¶71.  Instead, Bristol's solution was to modify MQ Series—IBM's message queuing middleware—as opposed to the other middleware technology described above, including point-to-point communications, transaction processing monitors, database middleware, application servers, or message brokers.   Schutz Decl., Ex. D, at ¶71; *see, also, supra,* Section III.B.  Bristol's focus was on an entirely different middleware solution, and was not working on making any changes to IBM's message broker, MQSeries Integrator.  Schutz Decl., Ex. D, at ¶71.  In fact, as the head of the IBM MQSeries consulting team during 2000, Mr. Schutz is confident that neither IBM, any IBM partner, nor any IBM customer had implemented the ability to monitor and track message movement by creating separate monitoring messages in a message broker via a messaging component and then sending those messages to a central message repository for storage in a transaction record.   Schutz Decl., Ex. D, at ¶71.

The few solutions that were available from vendors and local be-spoke solutions addressed the issue from a technical, not a business, perspective.  Schutz Decl., Ex. D, at ¶59.  That is to say, the offerings from the Systems Management vendors and messaging vendors provided tools to inspect the individual elements of the messaging network and did not provide an "end-to-end" view.  Schutz Decl., Ex. D, at ¶59.  As an example, many vendors had tools to detect abnormal numbers of messages in queues or failed communication channels between queuing systems.  Schutz Decl., Ex. D, at ¶59.  Although these techniques were useful in "keeping the messages flowing", they had no mechanism to monitor message movement as they passed through the enterprise, and as a result, could not identify the business impact of failing components or the efficiency of its processes. Schutz Decl., Ex. D, at ¶59.

**D. The Solutions Provided By the Inventions of the Patents-in-Suit.**

The patents describe a system for "measuring, monitoring, tracking and simulating enterprise communications and processes in an asynchronous messaging environment. '749 Patent at 1:7-11; Schutz Decl., <u>Ex. D</u>, at ¶60.   The Patents provide a solution to the "**Where's My Message**" problem by creating, through the custom developed messaging component, and "send(ing) [, through a message broker,] a separate monitoring message containing data . . . [which] may include date, time, customer number, materials, quantity, amount or other information and be copied from the original message." '749 Patent at 3:6-14; Fig. 2; Schutz Decl., <u>Ex. D</u>, at ¶61. Furthermore, "The monitoring message contains, in this embodiment, specific data fields . . . ." Those data field are, for example:

| FIELDS | IDENTIFIERS |
| --- | --- |
| PROCESS IDENTIFIER | ProID, |
| SUB-PROCESS IDENTIFIER | SbProID, |
| CUSTOMER NUMBER | Custno, |
| PART NUMBER | Partno, |
| QUANTITY | Qty, |
| DATE | Date, |
| TIME | Time |

'749 Patent at 4:24-38.[11]  A skilled artisan would have also understood that unique identifier serving as a globally unique identifier would have been present in all monitoring messages and would be used to correlate each individual monitoring message with other monitoring messages

---

[11] "The first field, the PROCESS IDENTIFIER field, provides the identifier for the process, for example, the value 'Order to Cash' because the monitoring message is being created within the Order to Cash Process.  The second field, the SUB-PROCESS IDENTIFIER field, provides the identifier for the sub-process, for example the value 'Inquiry' because the monitoring message is being created within the Inquiry sub-process.  This embodiment prepopulates these PROCESS IDENTIFIER and SUB-PROCESS IDENTIFIER fields, with the appropriate values." '749 Patent at 4:34-44.  Table 1 of '749 Patent shows a number of fields that might be present in the monitoring message.  *Id.*  Schutz Decl., <u>Ex. D</u>, at ¶63.

related to a specific business process, sub process, or activity in order to insert the data into the

"transaction record" present in each independent claim of the patents.  Schutz Decl., <u>Ex. D</u>, at

¶64.   This monitoring message is created by the messaging component of a messaging broker

and is provided by the message broker to the central message repository of the claims.  Schutz

Decl., <u>Ex. D</u>, at ¶65.  For example, IBM's MQSeries messaging broker provides a component

that can be configured to perform a copying function for the message it receives, and so create a

monitoring message for the messages it receives" '749 Patent at 3:64-67;  Schutz Decl., <u>Ex. D</u>, at

¶65.

When the patents disclose the fact that the "messaging broker provides a component that

can be configured to perform a copying function," a skilled artisan would understand that the

patents are referring to the capability that MQSeries Integrator provided to allow developers to

create custom components that could be created and coded to be used within MQSeries

Integrator.  Schutz Decl., <u>Ex. D</u>, at ¶65.  This was often referred to as a "plug-in." Schutz Decl.,

<u>Ex. D</u>, at ¶65.  This is a similar concept to what companies like Microsoft Corporation provide to

allow certain companies to add new functionality to Microsoft Word®. Schutz Decl., <u>Ex. D</u>, at

¶65.  For instance, Adobe Systems, Inc. coded a "plug-in" for Microsoft Word® that allows

Adobe customers to create PDF files directly from Microsoft Word®.  Schutz Decl., <u>Ex. D</u>, at

¶65.  Similarly, the inventors of the Patents-in-Suit created a custom component "plug-in" that

creates monitoring messages and stores them in a transaction record in the central message

repository that is updated as "monitoring messages progress through any given process and/or

sub-process."  '749 Patent at 4:56-67; Claim Construction Order, <u>Ex. C</u>, at 6.; Schutz Decl., <u>Ex.

D</u>, at ¶65.   The Patents-in-Suit specify a "central message repository or database" which acts as

an "'end point' for the asynchronous communication"  '749 Patent at 3:15-18; Schutz Decl., <u>Ex.

D, at ¶66.    This "central message repository" contains a transaction record which is populated

by the monitoring message. '749 Patent at 4:56-57; Schutz Decl., Ex. D, at ¶66.  The Patents-in-

Suit specify that "[a]s monitoring messages progress through any given process and/or

subprocess, the transaction record is updated". '749 Patent at 4:56-59.

     The Patents-in-Suit provide a solution to the problem [*e.g.,* lack of management layer

capabilities and ability to monitor message movement thorough the system] listed above by:

- Providing a monitoring message created by the messaging component [added
  management layer functionality] of a message broker which contains process and/or
  sub-process identifiers and key data elements from the original message.

- Transmitting said monitoring message to a central message repository and updating a
  transaction record in the central message repository with such data as process and/or
  sub-process identifiers and key data element from the original message, such
  transaction record being updated as monitoring messages progress through any given
  process and/or subprocess as the process progresses.

- Allowing for the monitoring of message movement through the system and capturing
  associated business data.

Schutz Decl., Ex. D, at ¶67.  The system of the asserted claims allows a user to obtain

"information about any particular order or customer, [including] information about process

efficiency . . . ." '749 Patent at 5:14-19; Schutz Decl., Ex. D, at ¶67.   The ability to have a

central message repository with correlated information about a specific customer request (or

order) associated with a particular instance of a business process allows the enterprise to

determine the status of that request (or order).  Schutz Decl., Ex. D, at ¶68.   If, for some reason,

a message between processes is lost or misplaced, this fact is reflected in the central database and

the last successful process or sub-process can be identified. Schutz Decl., Ex. D, at ¶68.   In

addition, because the transaction record is updated with timestamps as processes and sub-

processes are completed, the processing efficiencies can be determined.  Schutz Decl., Ex. D, at

¶68.

     The solution of the asserted claims requires the creation of a "messaging component"

within the message broker. Schutz Decl., Ex. D, at ¶73. This messaging component creates the monitoring message, and sends it to the central message repository, where it is stored in a transaction record. Schutz Decl., Ex. D, at ¶73. In Mr. Shutz's opinion, this was a creative and useful improvement on the state of the art at the time. Schutz Decl., Ex. D, at ¶73.

### E. Facts Related to Whether the Asserted Claim Preempt the Alleged Abstract Idea

The asserted claims do not block the public from practicing a large number of communication and enterprise management technologies, which were widely known to be used for "the collection and storage of information relating to a business process"[12] by those skilled in the art. Schutz Decl., Ex. D, at ¶85. For example, many enterprise software systems relied on synchronous communications, where a call is made, either to a local program or a remote program, and processing does not continue until the called program completes. Schutz Decl., Ex. D, at ¶86. Examples of these technologies include "Distributed Program Link" systems (such as IBM's CICS product) and Remote Procedure Call ("RPC") systems (such as Sun's Open Network Computing (ONC) Remote Procedure Call (RPC)). Schutz Decl., Ex. D, at ¶86; *see, supra,* Section III.A. The asserted claims do not prevent anyone from using these synchronous communication technologies for "the collection and storage of information relating to a business process". Schutz Decl., Ex. D, at ¶86.

Another example is Large File Transfer systems. Schutz Decl., Ex. D, at ¶87; *see, supra,* Section III.A. Many systems sent (and still send) large files from one application to another. Schutz Decl., Ex. D, at ¶87; *see, supra,* Section III.A. This is an asynchronous technology which does not use messaging, and is thus not covered by the asserted claims but could still be used for "the collection and storage of information relating to a business process." Schutz Decl., Ex. D,

---

[12] YYZ disagrees that the inventions of the Patents-in-Suit are subsumed by Defendants' alleged "abstract idea" and deny that the characterization of the alleged "abstract idea" is accurate.

at ¶87.  There were hundreds of products available that use this technology, mostly based on the

File Transfer Protocol (FTP).   Schutz Decl., Ex. D, at ¶87.   Still other systems could be

described as "point-to-point" communications technologies. Schutz Decl., Ex. D, at ¶88; *see,*

*supra,* Section III.A. These systems have the ability to use asynchronous message based

communications technologies, but do not use message brokers.  Schutz Decl., Ex. D, at ¶88; *see,*

*supra,* Section III.A.   Thus, these could still be used for "the collection and storage of

information relating to a business process" without practicing the claims of the Patents-in-Suit.

Schutz Decl., Ex. D, at ¶88.   Instead, they implemented business processes by sending messages

directly from one application to the next.  Schutz Decl., Ex. D, at ¶88.  When this is done, the

application must agree, *a priori*, upon the format of the message to be passed to each other.

Schutz Decl., Ex. D, at ¶88.  In addition, the application generating the message must be able to

address the message so that it can be delivered to the next application in the business process.

Schutz Decl., Ex. D, at ¶88.

Enterprises can choose to implement their business processes using transaction

Processing Monitors.  Schutz Decl., Ex. D, at ¶89.  Transaction processing monitors, such as

IBM's CICS and BEA's Tuxedo, have been used for decades to provide complete solutions to

business processes.  Schutz Decl., Ex. D, at ¶89; *see, supra,* Section III.A.  They would not be

considered as providing a brokering function however, as data format translation is not a built in

in function.  Schutz Decl., Ex. D, at ¶89.  Thus, this technology could still be used for "the

collection and storage of information relating to a business process" without practicing the

claimed inventions.   Schutz Decl., Ex. D, at ¶89.  According to Mr. Linthicum, "Transactional

middleware is a good fit with EAI because the architecture provides for a centralized server that's

able to process information from many different resources, such as databases and applications.

Moreover, it ensures delivery of information from one application to the next and supports a distributed architecture. " Schutz Decl., Ex. D, at ¶89. "None of the TP monitors or application servers that exist [in 2000] support either "out-of-the-box" content transformation or message transformation services, at least not without a lot of programming. Schutz Decl., Ex. D, at ¶89.

Like transaction processing monitors, application servers provide the ability for enterprises to provide complete solutions to business problems. Schutz Decl., Ex. D, at ¶90; *see, supra,* Section III.A.  Application Servers tend to be associated with web based system, and often are integrated with TP monitors to provide transactional capabilities.  Schutz Decl., Ex. D, at ¶90.  "Although application servers were created for Web-based transactions and application development, their usefulness to EAI is obvious, given their back-end integration capabilities." Schutz Decl., Ex. D, at ¶90.

Finally, even message brokers can be used in Enterprise Application Integration without creating monitoring messages and sending those messages to a central message repository as required by the asserted claims, and used in this way, could still be used for "the collection and storage of information relating to a business process" without practicing the claimed inventions. Schutz Decl., Ex. D, at ¶91.  The stated intent of message brokers (specifically IBM's Integrator) was to transform and route messages, not to provide a management layer. Schutz Decl., Ex. D, at ¶91.  According, using the technologies in the ways described above, there are hundreds of ways that the technologies available in 2000 could have been used for "the collection and storage of information relating to a business process" without practicing the claimed inventions.   Schutz Decl., Ex. D, at ¶91.  Thus, the very specific use of the technologies specified in the claims does not monopolize an alleged abstract idea described as "the collection and storage of information relating to a business process."   Schutz Decl., Ex. D, at ¶91.

### F.  Facts Related to the Alleged Representative Claim and Other Asserted Claims

Defendants argue that "Claim 1 of the '749 Patent is representative of the other asserted independent claims" and produced the claim language for the Court.  Defendants' Opening Brief, D.I. 116 at 6.  YYZ disagrees with this proposition.  However, even assuming that Claim 1 of the '749 is actually "representative," Defendants' presentation of the claim absent the claim constructions that apply present an incomplete picture of the relevant claim.  '749 Patent, Claim 1; Claim Construction Order, Ex. C; *see also,* Asserted Claims With Claim Constructions Inserted, attached as Appendix A (outlining the true scope and limitations of each claim).  As noted above in Sections III.A-E, Claim 1 of the '749 Patent, when properly construed pursuant to the Court's constructions, and in light of the technological explanations above in Sections III.A-E, provide for something considerably more precise than "saving data related to a business process in a database."  The other asserted claims of the Patents-in-Suit add significant features and details to the technology claimed in Claim 1 of the '749, none of which are "trivial" or "generic and conventional."[13]  *See, supra,* Sections III.A-E; *see also,* Appendix A.

### G.  Related Proceedings Involving The Alleged Joint Defense Group Leader

According to H-P's counsel, it is the lead counsel for the Defendants' joint defense group.  On December 23, 2014, H-P informed this Court that it had filed CBM petitions with the

---

[13] For example, Claim 2 of the '749 patent adds concrete step of "reviewing data collected" in the transaction record.  Claim 22 of the '749 patent requires monitoring two sub-processes. Claim 27 of the '749 patent adds the concrete step of "reviewing said central message repository." Claim 55 of the '749 patent requires that the original message data comprise the status of a "process."  Similarly, Claim 1 of the '674 patent requires that the original message data comprise the status of an "activity," "sub process," or "process," and adds the limitation of "retrieving information from the central message repository."  Claim 46 of the '674 patent requires "distributing information from the central message repository using a real-time tool which tracks the progress of transaction records and/or processes."  Claim 51 of the '674 patent includes the limitation of "reviewing data collected" in the transaction record and requires that the original message data comprises status information of a "process and/or sub process." Claim 70 of the '674 patent requires that two activities be monitored.

USPTO for the '749 and '674 Patents.  D.I. 113.  The petitions were attached as Exhibits A and B to the notification.  *Id.*  Notably, the petition was filed without the associated exhibits.  D.I. 113-1. In the petitions, H-P seeks review of the claims asserted against it by YYZ on several grounds, including unpatentable subject matter under 35 U.S.C. § 101.  *Id.* at pp. 29-39 ('794 Patent) and pp. 117-126 ('674 Patent).  In support of its unpatentable subject matter argument, H-P cites to the expert declaration of Mr. Jacobsen.  *Id.* at p. 38 ('794 Patent) and p. 125 ('674 Patent).  Notably, while joint defense group leader H-P chose to file an expert declaration on § 101 in the petition, Defendants neglected to file an expert declaration here.  Thus, Defendants have acknowledged that expert testimony is important to the § 101 analysis, yet chose to proceed without such testimony here.

H-P is also currently defending the validity of some of its own patents in an unrelated litigation.  In the matter of *Hewlett-Packard Company v. ServiceNow, Inc.*, Case No. 5:14-cv-00570-BL pending in the Northern District of California (hereinafter, the "ServiceNow case"), H-P faces a motion for summary judgment of invalidity under 35 U.S.C. § 101.  In a brief filed on January 14, 2015, H-P lays out its arguments for why four of its own patents should not be invalidated under 35 U.S.C. § 101.  *See* Case No. 5:14-cv-00570-BL, D.I. 79, attached as <u>Exhibit H</u> ("H-P's ServiceNow Brief").  In that briefing, H-P consistently characterizes the law to the Northern District of California in a way that directly contradicts the positions taken in Defendants' Opening Brief before this Court.[14]   Additionally, H-P filed a 60-page expert

---

[14] The extensive nature with which this is done is impossible to articulate without overwhelming the brief at hand. *See,* H-P's ServiceNow Brief, <u>Ex. H</u>, at p. 2 ("In determining whether claims are directed to patent-eligible subject matter, the Supreme Court has long emphasized 'the general rule that patent claims must be considered as a whole.'"), 3("A characterization of the patent claims that omits limitations or steps, or seeks to recast the actual language of the claim, should be rejected for purposes of a § 101 analysis;" "Importantly, nothing in Alice suggests that the use of a computer or computer-related concepts in a patent claim transforms the subject

declaration to support its ServiceNow Brief.  *See* Case No. 5:14-cv-00570-BL, D.I. 79, attached

as <u>Exhibit H</u> ("Menascé Declaration").  Undoubtedly, the Defendants' believe expert testimony

on technical evidence is vital to the § 101 analysis.  *See* H-P's ServiceNow Brief, Ex. H, at 6

(citing *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) and

arguing that "[u]nsubstantiated attorney argument regarding the meaning of technical evidence is

no substitute for competent, substantiated expert testimony.  It does not, and cannot, support [a

party's] burden on summary judgment.").

## IV.    ARGUMENT

### A.  The Patents-in-Suit Are Presumed Valid.

The Patents-in-Suit carry with them a presumption of validity.  Despite a suggestion by

Defendants to the contrary, when the validity of an issued patent is challenged under §101, the

presumption that the patent is valid remains and the party challenging validity still bears the

heavy burden of overcoming this presumption by clear and convincing evidence.  35 U.S.C. §

282(a)[15]; *Microsoft Corp. v. i4i Ltd. Partnership,* 131 S.Ct. 2238, 2242-2243, 2245, 180 L.Ed.2d

131 (2011) ("The burden to prove a patent invalid falls to the alleged infringer, who 'bears a

heavy burden of persuasion.'") (<u>quoting</u>  Justice Cardozo's opinion in *Radio Corp. of America v.

Radio Engineering Laboratories, Inc.*, 293 U.S. 1 at 8 (1934)); *Allergan, Inc. v. Apotex Inc.,* 754

F.3d 952, 958 (Fed. Cir. 2014); <u>cert. denied</u>, 2015 WL 132989, 83 U.S.L.W. 3270 (U.S. Jan. 12,

---

matter into something abstract and patent ineligible."), 4 ("Alice also does not hold or suggest
that a claim is abstract if the process can be performed by a human."), 5 ("Therefore, where
patent claims are directed to a particular technological improvement in a particular field, and do
not attempt to cover the field itself, there is no risk of preemption.")

[15] 35 U.S.C. § 282(a) In General.-A patent shall be presumed valid. Each claim of a patent
(whether in independent, dependent, or multiple dependent form) shall be presumed valid
independently of the validity of other claims; dependent or multiple dependent claims shall be
presumed valid even though dependent upon an invalid claim. The burden of establishing
invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

2015) (No. 14-465); *Intellectual Ventures I, LLC v. Motorola Mobility, LLC*, --- F.Supp.3d ----,

2014 WL 5468429, *3 (D. Del. Oct. 28, 2014).

When evaluating a challenge to a patent's presumed validity, a court must consider the

entire statutory scheme, which involves determining whether claims are directed to patentable

subject matter (35 U.S.C. § 101), are novel (35 U.S.C. § 102), are non-obvious (35 U.S.C. §

103), and are particularly described (35 U.S.C. § 112). *Bilski v. Kappos,* 130 S.Ct. 3218, 3225

(2010); *Microsoft Corp.,* 131 S.Ct. at 2242.   It is strictly within this statutory framework that the

Supreme Court stated that the "§ 101 patent-eligibility inquiry is <u>only</u> a threshold test." *Bilski,*

130 S.Ct. at 3225 (emphasis added).  Thus, the Patents-in-Suit are presumed valid.

### B.  Software and Business Methods Remain Eligible For Patent Protection.

The Supreme Court and Federal Circuit have made clear that software and business

methods remain eligible for patent protection and nothing in the Patents-in-Suit exclude them

from their statutory presumption of validity.   Section 101 of the Patent Act broadly defines

patent-eligible subject matter as "any new and useful process, machine, manufacture, or

composition of matter, or any new and useful improvement thereof."  While laws of nature,

physical phenomena, and abstract ideas alone cannot be patented, "[a]pplications of such

concepts to a new and useful end . . . remain eligible for patent protection." *Alice Corp. Pty. Ltd.*

*v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal citations and quotations omitted).

Indeed, as long as the patented claims do not preempt the "basic tools of scientific and

technological work" such that the Progress of Science and useful Arts is undermined, such

claims are patent eligible.  *Id.*; U. S. Const., Art. I, § 8, Cl. 8.   Indeed, the Supreme Court has

warned against extending this exclusionary evaluation too far such that it would "eviscerate

patent law," noting that "all inventions at some level embody, use, reflect, rest upon, or apply

laws of nature, natural phenomena, or abstract ideas." *Mayo Collaborative Services v. Prometheus Laboratories, Inc.,* 132 S.Ct. 1289, 1293, 182 L.Ed.2d 321 (2012).

Although the Supreme Court and Federal Circuit have provided new guidance on determining whether something is an unpatentable abstract idea or a patentable application of an abstract idea, the exact line between these two remains unclear.[16]   However, it is clear that business method patents are still patent eligible and have not been deemed *per se* invalid.  *Bilski,* 130 S.Ct. at 3228-3229 (noting that such a rule would render 35 U.S.C. § 273 superfluous, a violation of a canon for statutory interpretation).  Moreover, the Federal Circuit has explicitly acknowledged that software and business method patents are not excluded under 35 U.S.C. § 101.  See *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,*. --- F.3d ----, 2014 WL 7272219, *3 (Fed. Cir. Dec. 23, 2014) (no categorical business-method exception, *citing Bilski*); *buySAFE, Inc. v. Google, Inc.*, , --- F.3d ----, 2014 WL 4337771, *4 (Fed. Cir. Sep. 3, 2014) (same); *Ultramercial, Inc. v. Hulu, LLC,*  --- F.3d ----, 2014 WL 5904902, *4 (Fed. Cir. Nov. 14, 2014). ("We acknowledge this reality, and we do not purport to state that all claims in all software-based patents will necessarily be directed to an abstract idea. Future cases may turn out differently.").  In light of this precedent, the Patents-in-Suit are firmly grounded in patent eligible subject matter.

---

[16] *DDR Holdings, LLC v. Hotels.com, L.P.*, Case No. 2013–1505, --- F.3d ----, 2014 WL 6845152, *8 (Fed. Cir. Dec. 5, 2014) ("Distinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear.")

### C. The Claims of the Patents-in-Suit Are Patent Eligible Within The Framework Set Forth By Supreme Court and Federal Circuit.[17]

In *Alice*, the Supreme Court set forth a two-part test to evaluate patent eligibility. In the first step, a court must "determine whether the claims at issue are directed to one of those patent ineligible concepts," namely, a law of nature, physical phenomenon, or abstract idea. *Alice*, 134 S. Ct. at 2355.  If the claim is directed to one of these concepts, then the court must determine whether the claim has an "'inventive concept' – i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal citations and quotations omitted).

In determining whether claims are directed to patent-eligible subject matter, the Supreme Court has long emphasized "the general rule that patent claims 'must be considered as a whole.'" *Id*. at 2355 n.3 (quoting *Diamond v. Diehr*, 450 U.S. 175, 188 (1981)). That is, it is inappropriate to focus on individual claim elements in the § 101 analysis, and it is irrelevant to the issue of patent eligibility whether particular elements are themselves novel:

> In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made. The "novelty" of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter.

*Diehr*, 450 U.S. at 188-189.  A characterization of the patent claims that omits limitations or steps, or seeks to recast the actual language of the claim, should be rejected for purposes of a §

---

[17] H-P agrees with each legal principle presented in this Section and just recently argued them to the Northern District of California.  *See,* H-P's ServiceNow Brief, Ex. H, at pp. 2-5.

101 analysis.  *See, e.g., Ameranth, Inc. v. Genesis Gaming Solutions, Inc., No.* SACV 11-00189

AG, 2014 U.S. Dist. LEXIS 175600, at *16-19 (C.D. Cal. Nov. 12, 2014) (denying summary

judgment motion under § 101, inter alia, because defendant's characterization of invention

omitted claim limitations). Similarly, it is inappropriate to evaluate patent eligibility based on an

invention's purported "essence" or "gist." <u>See</u> *Aro Mfg. Co. v. Convertible Top Replacement*

*Co.,* 365 U.S. 336, 345 (1961) ("there is no legally recognizable or protected 'essential' element,

'gist' or 'heart' of the invention").  If it were proper to conduct a § 101 analysis based upon a

simplified distillation or summary of claim language, then virtually no claim would pass muster,

as "any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its

concrete limitations, until at its core, something that could be characterized as an abstract idea is

revealed." *Ultramercial v. Hulu, LLC*, 722 F.3d 1335, 1344 (Fed. Cir. 2013), *vacated on other*

*grounds*, 134 S. Ct. 2870 (2014); <u>see also</u> *Mayo*, 132 S. Ct. at 1293 ("all inventions at some level

embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.").

### 1.  The Claims Are Not Directed To An Abstract Idea.

Defendants' mischaracterize the asserted claims is and omit vital parts of the claims

despite case law explicitly rejecting this,  Defendants ignore these important claim elements in

order to portray the claims as simply the process of "the collection and storage of information

relating to a business process."   Defendants' Opening Brief, D.I. 116 at 2.  But this "abstract

idea" proposed by Defendants is much broader than the asserted claims.  Schutz Decl., <u>Ex. D</u>, at

¶37.   In fact, none of the asserted claims recites "collection," "storage," or "information relating

to a business process," as limitations.  *See, generally,* Appendix A.  Defendants fail to mention

that the specifications include thorough descriptions of the various claim elements that are

present in each independent claim, *see, e.g.,* '749 Patent at 3:3-4:19.  Additionally, the Court has

construed the independent claims to entail very specific limitations.  *See, supra,* Section III.F and

Appendix A; *see, also,* Claim Construction Order, <u>Ex. C</u>.  Below is the text of Defendants'

alleged representative claim that incorporates the Court's constructions:

> A computerized method for use in [*a computer-based environment in which data is transmitted through messages (instead of large files) without prior coordination between communication end points*], wherein said messaging environment comprises at least one [*message originating from a business process, sub process, or activity carrying information for the execution of a business process, sub process ,or activity*] comprised of [*data from the original message*], comprising:
>
>> [*sending, through a messaging broker*], a [*message distinct from an original message, created by the messaging component of a messaging broker that contains at least part of the original message data, where a messaging broker is communication software that performs at least message transformation and routing based on information in the message*], at least part of said original message data to a [*database for storing monitoring messages from more than one process, sub-process, or activity*];
>>
>> populating a [*record in the central message repository, such record being updated as monitoring messages progress through any given process and/or sub-process*] in said central message repository with said original message data provided by said monitoring message;
>>
>> wherein said original message data comprises the status of [*part of a step of a business operation*].

'749 Patent, Claim 1; Claim Construction Order, <u>Ex. C</u>.  Even the most cursory review of the

representative claim reveals that Defendants alleged abstract idea is no more than a decoupled

summary of the "essence" of the claims.  <u>See</u> *Ultramercial*, 722 F.3d at 1344; *Aro Mfg.,* 365 U.S.

at 345.

    When viewed properly, all asserted claims require at least an "asynchronous messaging

environment," a "monitoring message," a "messaging broker," a "central message repository," a

"transaction record," a "process," "sub process," or "activity," an "original message" and

"original message data,"  *See* Appendix A; '749 Patent; '674 Patent; Claim Construction Order,

Ex. C.[18]   To be clear, the asserted claims are only directed to a very specific computer

networking environment:  asynchronous message-based communications networks *which use a*

*message broker as middleware*.  Schutz Decl., Ex. D, at ¶¶37-53; *see, e.g.*, '749, Claim 1; *see,*

*also, supra,* Section III.A.  Defendants ignore these limitations.

Even if the idea proposed by Defendants were an accurate description of the claims, the

"idea" proposed by Defendants is not an "abstract idea."  The Supreme Court's judicial

exceptions to the scope of §101 insure that "fundamental truths," "the basic tools of scientific

and technological work," "the building blocks of human ingenuity," cannot be patented.  *Alice*,

134 S. Ct. at 2355.   Defendants have made no attempt to show that the idea of "the collection

and storage of information relating to a business process" is a fundamental truth, or a building

block of human ingenuity, the patenting of which would pre-empt the use of basic tools of

scientific and technological work. *Id.*; see also *Helios Software, LLC v. SpectorSoft Corp*., Case

No. 12-cv-081-LPS 2014 WL 4796111 at 17 (D. Del. Sep. 18, 2014) ("SpectorSoft makes no

effort to show that these ideas are fundamental truths or fundamental principles the patenting of

which would pre-emp the use of basic tools of scientific and technological work.")

*Importantly, nothing in Alice suggests that the use of a computer or computer-related*

*concepts in a patent claim transforms the subject matter into something abstract and patent*

*ineligible.*[19]   Rather, the Alice Court narrowly ruled that "the mere recitation of a generic

computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."

*Alice*, 134 S. Ct. at 2358.  At the same time, the Court recognized that the use of a computer to

"improve the functioning of the computer itself" or to "effect an improvement in any other

---

[18] Other requirements and limitations are provided by other asserted claims.  *See, supra,* Section
III.F, fn. 13.
[19] H-P agrees with this legal principle.  *See,* H-P's ServiceNow Brief, Ex. H, at p. 3.

technology or technical field" is patent eligible subject matter. *Id.* at 2359; see also *Diehr*, 450

U.S. at 187 ("A claim drawn to subject matter otherwise statutory does not become nonstatutory

simply because it uses a . . . computer program . . . or digital computer."). The Federal Circuit

has also found claims to be patent eligible in "cases where, as a practical matter, the use of a

computer is required to perform the claimed method," including claims involving "the

manipulation of computer data structures" or "the output of a modified computer structure"

where "the method could not, as a practical matter, be performed entirely in a human's mind."

*Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1376 (Fed. Cir. 2011) (discussing

the patent-eligible claims in *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed.

Cir. 2010)); see also *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2013-1505, 2014 U.S. App.

LEXIS 22902, at *26 (Fed. Cir. Dec. 5, 2014) (finding claim patent eligible where "the claimed

solution is necessarily rooted in computer technology in order to overcome a problem

specifically arising in the realm of computer networks"). "[P]atents should encourage inventors

to create new computing solutions to today's computing problems. . . . [I]t at least must be true

that § 101 protects a unique computing solution that addresses a unique computing problem."

*Cal. Inst. Of Tech. v. Hughes Commc'ns, Inc.*, No. 2:13-CV-07245-MRP-JEM, 2014 U.S. Dist.

LEXIS 156763, at *62 (C.D. Cal. Nov. 3, 2014).

     Although message brokers existed, message brokers were far from being "conventional

and generic technology." Schutz Decl., Ex. D at ¶¶54-78; *supra,* Section III.A; see, also *Cal.*

*Inst. Tech. v. Hughes Comm., Inc.,* 2014 WL 5661290, at *3 ("a claim element is not

conventional just because it appears in prior art"). In fact, in the very late 1990s and early 2000s,

YYZ's expert, Mr. Schutz, and Defendants' expert, Mr. Linthicum, agree that message brokers

were a very "new technology" that was just beginning to be used to integrate enterprise

application systems.  Schutz Decl., Ex. D, at ¶55.   Despite offering "real promise," message

brokers had a "lack of standardization" and functionality, including a lack of management layer

tools resulting in an absence of the "ability to monitor message movement through the system."

Linthicum I, Ex. E, at pp. 10, 21, 120, 293, 309, 316;  Linthicum II, Ex. F at pp. 128, 146, 233,

234, 248-249, 257; Schutz Decl., Ex. D at ¶78.  This was a problem in this very specific

computer networking environment where the patents exist.  Schutz Decl., Ex. D, at ¶¶47-50

This inability to monitor message movement was referred to as the "Where's My

Message?" problem.  '749 Patent at 2:6-9; Schutz Decl., Ex. D, at ¶50.   The Patents-in-Suit

provide novel solution to the "Where's My Message" problem by creating, through the custom

developed *messaging component*, and sending, through a message broker, "a separate

monitoring message containing data . . . [which] may include date, time, customer number,

materials, quantity, amount or other information and be copied from the original message." '749

Patent at 3:6-14; Fig. 2; Schutz Decl., Ex. D, at ¶61.  The Patents-in-Suit provided a significant

advantage over other solutions because it offered a solution from a technical and business

perspective, not just a technical perspective—in other words, it provided an "end to end" view of

the message flow.  Schutz Decl., Ex. D, at ¶¶59-60.   These were novel concepts at the time.

Schutz Decl., Ex. D, at ¶¶67-68.

*Alice also does not hold or suggest that a claim is abstract if the process can be*

*performed by a human.*[20]   If Defendants' position were adopted by this Court, their own cited

patent covering "carbon copy" technology would be patent ineligible because a person could

simply copy the original document by hand in order to create a copy.  *See* U.S. Patent No.

2,307,036, attached to Defendants' Motion, at Ex. F.  As one court has observed, even the cotton

---

[20] As of a short time ago, H-P agreed with this legal principle.  *See,* H-P's ServiceNow Brief, Ex.
H, at p. 4.

gin would not be patentable under this test.  *Ameranth*, 2014 U.S. Dist. LEXIS 7012391, at *19

("[A]utomation of manual tasks is not necessarily abstract. U.S. Patent No. 72 (1794) to Eli

Whitney for a cotton gin is one familiar example of a solidly tangible automating machine.").

Thus, a bald proclamation that a process can be done by a human does not render a claim

abstract.

       Contrary to Defendants' arguments, the patent claims cannot be performed entirely by

humans.  With the exception of business "process," "sub process," or "activity," the claim

elements only have meaning within a computer.  For example, human cannot operate in an

asynchronous messaging environment, which has been construed to mean "[a] computer-based

environment in which data is transmitted through messages (instead of large files) without prior

coordination between communication end points."  Claim Construction Order, Ex. C, at 2;

Schutz Decl., Ex. D, at ¶91.  Nor can a human cannot operate in the "asynchronous messaging

environment" of the Patents-in-Suit as construed by the Court.  Schutz Decl., Ex. D, at ¶91.

Another example is a "monitoring message," which means "[a] message distinct from an original

message, created by the messaging component of a messaging broker that contains at least part

of the original message data, where a messaging broker is communication software that performs

at least message transformation and routing based on information in the message."  Schutz Decl.,

Ex. D, at ¶91.  Messaging broker is communication software that must run in a computer

network environment, and as such, a human cannot operate as a "messaging broker" as construed

by the Court.  Schutz Decl., Ex. D, at ¶91.  These limitations, coupled with the requirements of a

"monitoring message," "transaction record," and "central message repository" would prohibit a

human from accomplishing the teachings of the Patents-in-Suit.  Schutz Decl., Ex. D, at ¶91.

The fact that there may be an analogue to the inventions of the Patents-in-Suit in the human

world does not render the asserted claims abstract.  *Ameranth*, 2014 U.S. Dist. LEXIS 7012391,

at *19 ("[A]utomation of manual tasks is not necessarily abstract.").   Thus, Defendants

presentation of a hypothetical "intra-office mail" scenario is unpersuasive.

>     ***Nor does Alice hold or suggest that computer inventions are unpatentable if they***
>
> ***involve mental steps that can be performed by a person using pen and paper***.[21]  Indeed, for
>
> computer inventions such as the patents-in-suit, "this mode of analysis" is simply "unhelpful," if
>
> not outright misleading:

> Many inventions could be theorized with pencil and paper, but pencil and paper
> can rarely produce the actual effect of the invention. Likewise, with regard to
> software, a human could spend months or years writing on paper the 1s and 0s
> comprising a computer program and applying the same algorithms as the
> program. At the end of the effort, he would be left with a lot of paper that
> obviously would not produce the same result as the software. The problems of
> pencil-and-paper analysis are heightened in the context of software, which
> necessarily uses algorithms to achieve its goals. Pencil-and-paper analysis can
> mislead courts into ignoring a key fact: although a computer performs the same
> math as a human, a human cannot always achieve the same results as a computer.

*Cal. Inst. of Tech.*, 2014 U.S. Dist. LEXIS 156763, at *49-50.  Accordingly, H-P's arguments

that many of the limitations of the claims can be performed by the human mind or with pen and

paper are unavailing.  Defendants' Opening Brief, D.I. 116 at 14-17.  A human being has many

ways to collect and store data relating to a business process using only his mind, or even pencil

and paper.  Schutz Decl., Ex. D, at ¶91.  However, each asserted claim is firmly grounded in

particular technology choices and fixed problems that existed in the art with respect to those

technologies in innovative ways.  Schutz Decl., Ex. D, at ¶¶59-60, 67-68.  A human being cannot

perform any of the methods of the asserted claims solely in their mind, or even with pencil and

paper.  Schutz Decl., Ex. D, at ¶91.   Each asserted claim recites a "computerized method for use

---

[21] H-P agreed with this legal principle very recently.  *See,* H-P's ServiceNow Brief, Ex. H, at pp.
4.

in an asynchronous messaging environment." Schutz Decl., Ex. D, at ¶91.   A human being using pencil and paper cannot function in a computerized asynchronous messaging environment. Schutz Decl., Ex. D, at ¶91.   Nor could a human being using pencil and paper implement the specific, concrete solution of the asserted claims.  Schutz Decl., Ex. D, at ¶91.   A human being could not cause a "messaging component" of a "message broker" to create a "monitoring message" that is sent through the message broker to a "central message repository" where it is stored in a "transaction record." Schutz Decl., Ex. D, at ¶91.

### 2. The Patents Claim Inventive Concepts.

The Patents-in-Suit are directed to inventive concepts necessarily rooted in computer technology.  *See, supra,* Section III.D.  The asserted claims have independently innovative components and are an innovative ordered combination.  The Patents provide a technology solution to the "Where's My Message" problem.  *See, supra,* Section III.D.  This is a problem that existed in asynchronous message based networking environments where a message broker was used.  *See, supra,* Section III.D.  The problem was addressed by creating, through the custom developed messaging component, and sending, to a central message repository through a message broker, a separate monitoring message containing data which may have include date, time, customer number, materials, quantity, amount or other information and be copied from the original message" '749 Patent at 3:6-14; Fig. 2; Schutz Decl., Ex. D, at ¶61; *see, also, supra,* Section III.D.   This monitoring message, which was created by the messaging component of a messaging broker, is provided by the message broker to the central message repository in the claims.  Schutz Decl., Ex. D, at ¶65.  To accomplish this, the inventors created a custom component that was created by the inventors and then imported and used within MQSeries Integrator.   Schutz Decl., Ex. D, at ¶65.  This type of custom software coding was often referred to as creating a software "plug-in." Schutz Decl., Ex. D, at ¶65.  This was an innovative and

novel approach to solving the "Where's my message?" problem.  Schutz  Decl., Ex. D, at ¶70-75; *see, also, supra,* Section III.D.

Similarly, the inventors of the Patents-in-Suit created a "central message repository" that is updated as "monitoring messages progress through any given process and/or sub-process." Schutz Decl., Ex. D, at ¶65.  This "central message repository" contains a transaction record which is populated by the monitoring message, which is sent from the messaging broker (after it is created by the messaging component) to the "central message repository." '749 Patent at 4:56-57; Schutz Decl., Ex. D, at ¶66.  The Patents-in-Suit specify that "[a]s monitoring messages progress through any given process and/or subprocess, the transaction record is updated." '749 Patent at 4:56-59.   In Mr. Shutz opinions, the central repository of the Patents-in-Suit, which store monitoring messages created by the messaging component of a messaging broker and that stores the data from those messages in a transaction record, was also innovative and did not exist as of the priority date of the Patents-in-Suit.  Schutz Decl., Ex. D, at ¶¶65, 78-84.  In sum, the solution of the asserted claims requires the creation of a "messaging component" within the message broker.   Schutz Decl., Ex. D, at ¶73.  This messaging component creates the monitoring message, and sends it to the central message repository (via the message broker), where it is stored in a transaction record.   Schutz Decl., Ex. D, at ¶73.   In Mr. Shutz's opinion, this was a creative and useful improvement on the state of the art at the time.  Schutz Decl., Ex. D, at ¶73.

### 3.   The Claims of the Patents Do Not Preempt the Alleged Abstract Idea

A significant concern underlying § 101 is preemption.  *Alice*, 134 S. Ct. at 2354. However, a court "must be wary about overstating this concern" given that "[b]y definition, every patent preempts an area of technology." *Cal. Inst. of Tech.*, 2014 U.S. Dist. LEXIS 156763, at *37. "[W]e must be wary of facile arguments that a patent preempts all applications

of an idea. It may often be easier for an infringer to argue that a patent fails § 101 than to figure out a different way to implement an idea, especially a way that is less complicated . . . ." *McRo, Inc. v. Sega of Am., Inc.*, No. CV 12-10327-GW, 2014 U.S. Dist. LEXIS 135267, at *19 (C.D. Cal. Sept. 22, 2014) (internal citations and quotations omitted). "[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Research Corp.*, 627 F.3d at 869.  Therefore, where patent claims are directed to a particular technological improvement in a particular field, and do not attempt to cover the field itself, there is no risk of preemption. See, e.g., *DDR Holdings*, 2014 U.S. App. LEXIS 22902, at *14 ("[T]he claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by NLG. Rather, they recite a specific way to automate the creation of a composite web page . . . ."); *Intellectual Ventures I LLC v. Mfrs. & Traders Trust Co.*, Civ. No. 13-1274-SLR , 2014 U.S. Dist. LEXIS 174725, at *25 (D. Del. Dec. 18, 2014) ("The claims do not preempt all applications of providing customized web pages, as they recite a specific method of customizing web pages . . . ."); *Fairfield Indus. v. Wireless Seismic, Inc.*, No. 14-CV-2972, 2014 U.S. Dist. LEXIS 176599, at *15 (S.D. Tex. Dec. 23, 2014) ("Although the claim rests upon the idea of a relay system, the claim builds upon this concept by adding nonconventional elements, such as the assignment of different transmission parameters to avoid jumbled communication. These additional elements narrow the scope of the claim, and minimize the risk of preemption.").

The inventions of the Patents-in-Suit are similar in nature to those in *DDR Holdings*.  The inventions of the Patents-in-Suit use a very specific set of technologies and invented a specific set of solutions to the problems in that technology environment, and thus, could not possibly

preempt the alleged abstract idea.  At the outset, there were a broad set of options for the architecture of such a system as described in the Patents-in-Suit, including several options for the (1) data transfer technology, (2) the communication network technology, and (3) the middleware technology.  Schutz Decl., <u>Ex. D</u>, at ¶38.  First, from the available set of data transfer technologies, the inventors chose, and claims of the patents-in-suit are only directed to, message-based systems.  Schutz Decl., <u>Ex. D</u>, at ¶38-40; *see also, e.g.,* '749, Claim 1; Claim Construction Order, <u>Ex. C</u>, at 2 (construction for "asynchronous messaging environment"); *see, also, supra,* Section II.A.  Second, the inventors were working in a specific communication network.  From the set of available communication network technology, which included asynchronous or synchronous network technologies, the inventors chose to provide a solution for problems asynchronous message-based communications networks.    Schutz Decl., <u>Ex. D</u>, at ¶¶40-46.  Schutz Decl., <u>Ex. D</u>, at ¶47; *see also, e.g.,* '749, Claim 1; Claim Construction Order, <u>Ex. C</u>, at 2 (construction for "asynchronous messaging environment"); *see, also, supra,* Section II.A.  Third, the inventors had to choose the type of middleware technology to use in the system.  Schutz Decl., <u>Ex. D</u>, at ¶¶51-52.  Of the at least five different technologies that existed at the time, the inventors chose to use message brokers to solve the salient problems.   Schutz Decl., <u>Ex. D</u>, at ¶¶52-53. In the end, the claims of the patents-in-suit are only directed to asynchronous message-based communications networks which use a message broker as middleware.  Schutz Decl., <u>Ex. D</u>; *see, also, supra,* Section II.A.  Given the myriad of choices available to the inventors, they chose to solve a set of problems existing in a very communication networking environment.

The asserted claims do not block the public from practicing a large number of communication and enterprise management technologies, which were widely known to be used for "the collection and storage of information relating to a business process" by those skilled in

the art.   Schutz Decl., Ex. D, at ¶¶85-86.   For example, the asserted claims do not prevent

anyone from using synchronous communication technologies, FTP systems, point-to-point

systems without a message broker, Transaction Processing Monitors, applications servers lacking

a message broker, and even message brokers themselves (as long as they do not have the

"messaging component" and "central message repository" of the asserted claims) for "the

collection and storage of information relating to a business process".  Schutz Decl., Ex. D, at

¶¶86-91; *see, supra,* Section III, A and E.   According, using the technologies in the ways

described above in Sections III. E, there are hundreds of ways that the technologies available in

2000 could have been used for "the collection and storage of information relating to a business

process" without practicing the claimed inventions.   Schutz Decl., Ex. D, at ¶91.  Thus, the very

specific use of the technologies specified in the claims does not monopolize an alleged abstract

idea described as "the collection and storage of information relating to a business process."

Schutz Decl., Ex. D, at ¶91.

### D. The Factual Issues Underlying Defendants' Motion Are Disputed, Precluding Summary Judgment.

The Federal Circuit has recently emphasized that "the analysis under § 101, while

ultimately a legal determination, is rife with underlying factual issues." *Ultramercial*, 722 F.3d at

1339 (emphasis added). The Federal Circuit has identified many reasons the § 101 inquiry is

inherently fact specific:

> [T]here is no doubt the § 101 inquiry requires a search for limitations in the claims that narrow or tie the claims to specific applications of an otherwise abstract concept. Further, factual issues may underlie determining whether the patent embraces a scientific principle or abstract idea. *If the question is whether "genuine human contribution" is required, and that requires "more than a trivial appendix to the underlying abstract idea," and were not at the time of filing "routine, well-understood, or conventional," factual inquiries likely abound.    Almost    by    definition,    analyzing    whether    something    was*

> *"conventional" or "routine" involves analyzing facts. Likewise, any inquiry into the scope of preemption – how much of the field is "tied up" by the claim – by definition will involve historic facts: identifying the "field," the available alternatives, and preemptive impact of the claims in that field.*

*Id.* (internal citations omitted) (emphasis added).

Here, Defendants' support their § 101 analysis with attorney argument alone, which itself is inadmissible evidence and does not satisfy Defendants' burden at summary judgment of demonstrating "such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." *SRAM Corp. v. ADII Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006). "Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony.  It does not, and cannot, support [a party's] burden on summary judgment." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005); *see also Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.").

Even if Defendants had supported their attorney arguments with competent expert evidence, the underlying factual issues are disputed by YYZ's expert, thereby making summary judgment of invalidity under § 101 inappropriate. See *Fr. Telecom S.A. v. Marvell Semiconductor Inc.*, No. 12-CV-04967-WHO, 2014 U.S. Dist. LEXIS 52564, at *40 (N.D. Cal. Apr. 14, 2014) (where one party's expert was "directly controverted" by the other, "[t]his is a material issue of fact sufficient to defeat summary judgment" of patent invalidity under § 101); *TQP Dev., LLC v. Intuit Inc.*, No. 12-CV-180, 2014 U.S. Dist. LEXIS 20077, at *17-18 (E.D. Tex. Feb. 19, 2014) ("While the defendants assert that the encryption and decryption process can be performed in the human mind or with pencil and paper, TQP has offered evidence to the

contrary, in the form of an expert's declaration. . . . That factual dispute by itself is enough to foreclose the entry of summary judgment in the defendants' favor on the present record.").

The law relevant to summary judgment is well settled. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). Only if the moving party has carried its burden must the nonmovant then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

Assuming such facts have been presented, the record and all factual inferences therefrom must be viewed in the light most favorable to the non-moving party, and the Court must decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (*quoting Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). "[C]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct.

2505." *Powell v. Carey Intern., Inc.*, 490 F.Supp.2d 1202, 1208 (S.D. Fla. Mar. 17, 2006); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

## V.      CONCLUSION

For the aforementioned reasons, the Court should deny Defendants' motion for summary judgment that the asserted claims Patents-in-Suit are invalid under §101 and grant YYZ's cross-motion for summary judgment that the asserted claims of the Patent-in-Suit are not invalid under §101.

Date:   <u>February 27, 2015</u>          Respectfully submitted,

**FARNAN LLP**


<u>/s/ Michael J. Farnan</u>
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com


Jacqueline K. Burt (*pro hac vice*)
James F. McDonough, III (*pro hac vice*)
Jonathan R. Miller (*pro hac vice*)
**HENINGER GARRISON DAVIS, LLC**
3621 Vinings Slope, Suite 4320
Atlanta, Georgia  30339
Telephone: (404) 996-0861, 0869, 0863
Facsimile: (205) 547-5502, 5504, 5506
Email: jburt@hgdlawfirm.com
Email: jmcdonough@hgdlawfirm.com
Email: jmiller@hgdlawfirm.com


Steven W. Ritcheson (*pro hac vice*)
**HENINGER GARRISON DAVIS, LLC**
9800 D Topanga Canyon Blvd. #347
Chatsworth, California 91311
Telephone: (818) 882-1030
Facsimile: (818) 337-0383
Email: swritcheson@hgdlawfirm.com


René A. Vazquez (*pro hac vice*)
**HENINGER GARRISON DAVIS, LLC**
18326 Buccaneer Terrace
Leesburg, Virginia 20176
Telephone: (571) 206-1375
Facsimile: (205) 327-9114
Email: rvazquez@hgdlawfirm.com


*Attorneys for Plaintiff YYZ, LLC*